[Cite as *State v. Hurley*, 2014-Ohio-2716.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### HARDIN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO. 6-13-02

      v.

JASON SCOTT HURLEY,             **O P I N I O N**

      DEFENDANT-APPELLANT.

Appeal from Hardin County Common Pleas Court
Trial Court No. 20122017-CRI

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision:   June 23, 2014**

APPEARANCES:

    *Michael B. Kelley* **for Appellant**

    *Bradford W. Bailey and Destiny R. Hudson* **for Appellee**

**SHAW, J.**

{¶1} Defendant-Appellant, Jason Hurley ("Hurley"), appeals the July 3, 2013 judgment of the Court of Common Pleas of Hardin County, finding him guilty of three counts of possession of heroin, two counts of possession of criminal tools, three counts of trafficking in heroin, and two counts of trafficking counterfeit controlled substances and sentencing him to 36 months in prison. On appeal, Hurley contends that the trial court erred by: (1) entering guilty verdicts that were based on insufficient evidence and against the manifest weight of the evidence; (2) failing to merge his criminal tools convictions with his trafficking in heroin convictions as allied offenses; and (3) imposing maximum and consecutive sentences. For the reasons that follow, we affirm in part and reverse in part the trial court's judgment.

{¶2} On February 8, 2012, the Hardin County Grand Jury returned a ten count indictment against Hurley, charging him with three counts of possession of heroin in violation of R.C. 2925.11(A), (C)(6)(a), felonies of the fifth degree; two counts of possession of criminal tools in violation of R.C. 2923.24(A), felonies of the fifth degree; three counts of trafficking in heroin in violation of R.C. 2925.03(A)(1), (C)(6)(a), felonies of the fifth degree; and two counts of trafficking in counterfeit controlled substances in violation of R.C. 2925.37(B), felonies of the fifth degree.

{¶3} A jury trial was held in this matter on June 27, 2013. The following relevant evidence was adduced during the State's case-in-chief.

{¶4} The State's first witness was Detective Brian Beach of the City of Kenton Police Department. Detective Beach explained that he is part of the Hardin County Crime Task Force (the "Task Force") which primarily handles narcotic investigations. The Task Force was investigating Hurley and decided to use a confidential informant, who was later identified as Kimberly Hitchcock, in an attempt to gather evidence against Hurley. Detective Beach testified that Hitchcock had completed a total of four controlled drug buys for the Task Force, and three involved Hurley. The Task Force compensates its confidential informants by paying them 100 dollars per controlled drug buy. Detective Beach opined that Hitchcock was reliable and credible in her information.

{¶5} On September 28, 2011, Hitchcock had completed a controlled drug buy for the Task Force at Hitchcock's apartment complex. Detective Beach testified that the terms of the drug buy were set up through the use of cell phones by "texting back and forth." (Trial Tr. at 18). He stated that Hitchcock told him she was text messaging with Hurley. Hitchcock arranged to get five hits of heroin in exchange for 100 dollars.

{¶6} Hitchcock was searched both before and after each transaction with Hurley. Detective Beach explained that this was part of the Task Force's protocol

to ensure that a CI does not have contraband on them either before or after a controlled drug buy. Detective Beach testified that they found nothing on Hitchcock the day of the first buy. Hurley subsequently arrived at Hitchcock's apartment in a car driven by Mike Collins and registered to Stephanie Reth. Hurley was seated in the back seat while Reth was in the passenger's seat. Hitchcock entered the car and then exited shortly after.

{¶7} Detective Beach then explained that he had placed a wire on Hitchcock. The State then played the recording for the jury. Detective Beach identified the male voice on the recording as Hurley's and the female voice as Hitchcock's. After Hitchcock exited the vehicle, she gave Detective Beach the five hits of heroin. He then performed a NIK field test on one of the hits, which tested positive for heroin. After Detective Beach conducted the field test, he packaged the evidence and then placed it in a locker at the Sheriff's Office. The evidence was later sent to the BCI Crime Laboratory where more testing was done.

{¶8} Detective Beach then testified to events that occurred on October 4, 2011. He explained that Hitchcock made another controlled drug buy that day. This time, the controlled drug buy took place at Hurley's residence at 434 1/2 East North Street in Kenton, Ohio ("Hurley's residence"). Reth's car was parked in the driveway. Detective Beach testified that Reth and Collins were living with Hurley

in October of 2011. Detective Beach testified that Hitchcock was again "texting back and forth with [Hurley]," and arranged for the purchase of five hits of heroin in exchange for 100 dollars. (Tr. at 49). Hitchcock was searched both before and after the drug buy and nothing was found on her. Hitchcock again carried a wire in her purse and the recording was played for the jury. Detective Beach identified the male voice as Hurley's and the female's voice as Hitchcock.

{¶9} Once Hitchcock completed the controlled drug buy, she gave Detective Beach the five hits of heroin. He then conducted another NIK field test on one of the hits and it tested positive for heroin. The evidence was then packaged and placed into the evidence locker at the Sheriff's Office.

{¶10} On October 10, 2011, Hitchcock made another controlled drug buy for the Task Force. This time, Hitchcock arranged "through phone, text, and call" to purchase 11 hits of heroin from Hurley in exchange for two hundred dollars. (Tr. at 70). This transaction took place at Hurley's residence around 1:25 p.m. Detective Beach testified that he once again searched Hitchcock before and after the buy and did not find any contraband. Hitchcock walked up to Hurley's door, knocked for a while, and then went inside the house. After a few minutes, Hitchcock came out of Hurley's house and met up with Detective Beach.

{¶11} Again, Hitchcock carried a wire, and the wire was played for the jury. On this recording there were multiple voices. Detective Beach testified that

he did not recognize all the voices but could identify Hurley's and Hitchcock's voices. He then testified that the drugs were field tested while he applied for a search warrant for Hurley's residence. The search warrant was executed that same day, around 3:15 p.m. Only three people, Dennis Turner, Casey Stephens, and Reth, were found inside the house. Detective Beach explained the Task Force had assigned Deputy Rushing to watch over the house while Detective Beach applied for a search warrant. However, Deputy Rushing never indicated that Hurley had left his residence. None of the money used for the controlled drug buys were found at Hurley's residence. Nor was any testimony elicited from Detective Beach concerning whether the Task Force found any cell phones during the execution of the search warrant.

{¶12} On cross-examination, Detective Beach stated that he did not drug test Hitchcock while she was working for the Task Force. He also admitted that the Task Force did not have a female officer search Hitchcock before or after the controlled drug buys. Further, Detective Beach stated that Hitchcock misidentified people during her controlled drug buys. Detective Beach also stated that there were a lot of drugs that were found in the house when he executed the search warrant.

{¶13} Concerning the text messages, Detective Beach admitted that he never saw or took any pictures of the text messages. Detective Beach also did not

pull phone records in order to confirm there was communication between Hitchcock and Hurley. Detective Beach also testified that he never asked Hitchcock if he could look at the text messages.

{¶14} The next witness to testify for the State was Deputy Jesse Rushing of the Hardin County Sheriff's Office. While currently a K9 handler, Deputy Rushing was a Detective for the Hardin County Crime Task Force in September and October of 2011. On October 10, 2011, Deputy Rushing was charged with providing surveillance of Hurley's residence. While Detective Beach left to apply for a search warrant, Deputy Rushing remained to watch over Hurley's residence. Deputy Rushing testified that he had to move once during his surveillance because one of Hurley's neighbors seemed to be getting suspicious of him. In an attempt to keep his cover, Deputy Rushing went around the block and parked farther west on North Street, in order to get out of the neighbor's view. This limited his ability to see the door to Hurley's residence. Deputy Rushing also testified that at one point, a blue Neon pulled up that blocked his view to the entrance of Hurley's residence.

{¶15} On cross-examination, Deputy Rushing testified that he left out in his report that he moved during his surveillance. Deputy Rushing could not remember if anyone got out of the blue Neon. He testified that he did not see

Hurley come or go from the apartment during his surveillance. Deputy Rushing did see an unidentified male enter and leave Hurley's residence.

**{¶16}** Kimberly Hitchcock then testified for the State. She testified that in the fall of 2011, her husband was texting with Detective Beach who "want[ed] [Hurley] really bad" and her husband asked her to become a confidential informant for Detective Beach. (Tr. at 118-119). She testified that she became a confidential informant in order to get paid. Hitchcock also testified to the following:

> **Q: Okay. And did you use drugs or have any contact with Jason Hurley regarding drugs?**
>
> **A: Yes.**
>
> **Q: Tell us about that please.**
>
> **A: He would drive over to my house and sell me some, or I would meet him somewhere and buy from him.**
>
> **Q: And how would you know where to meet Mr. Hurley?**
>
> **A: By phone, texting.**
>
> **Q: Okay, and was that some standard thing you would do with Mr. Hurley?**
>
> **A: Yes.**
>
> **Q: Was that a practice you had established before you started working with the task force?**
>
> **A: Yes.**

> **Q: What was your drug problem like in 2011?**
>
> **A: Pretty bad.**
>
> **Q: Okay. Were you using heroin on a daily basis?**
>
> **A: Yes. Heroin, pills, weed,**
>
> **Q: Okay.**
>
> **A: Anything.**

(*Id*. at p. 121-122).

{¶17} Hitchcock also testified that she is currently in an out-patient rehab and is prescribed suboxone to help her stay sober. She also stated that she got convicted of a felony forgery and of petty theft, and as part of her sentence she was ordered to join the rehab facility she is currently in.

{¶18} During the first controlled drug buy, Hitchcock stated that "someone drove [Hurley] over to my house, my apartment, and I got in the car with him and bought some." (Tr. at 126). She stated that she bought five hits of heroin for 100 dollars. She also testified that Hurley was not driving and was in the back seat. She stated that Collins was driving and there was a female in the passenger seat. She testified that Hurley was the one who handed her the five foil balls. When asked how she knew Hurley would come meet her, Hitchcock replied, "[c]ause he had done it before." (Tr. at 129). She then testified that at first, Hurley had discussed meeting at a different place, but eventually decided to meet at

Hitchcock's apartment. She elaborated that she and Hurley were text messaging when deciding where to meet.

{¶19} On October 4, 2011, Hitchcock testified that she went to Hurley's house to buy heroin again. When she arrived, Hurley was playing a video game in his bedroom and then they walked out to his garage. He then gave her five hits of heroin and she gave Hurley 100 dollars.

{¶20} Hitchcock went back to Hurley's residence on October 10, 2011 to make a third controlled drug buy. She testified that this was set up through text messages. Hitchcock bought 11 hits from Hurley for 200 dollars. She stated:

> **A: I went to his door, and I remember knocking for quite a while, and I remember some girl saying oh, there's some little girl at your door, and she opened the door and let me in, and I went in and gave [Hurley] the money, and he gave me the heroin, and I left.**

(Tr. at 137).

{¶21} On cross-examination, Hitchcock admitted that she met with an investigator who worked for the Hardin County Prosecutor's Office and discussed this case. She also stated that in her written statement she made after the first controlled drug buy, she was able to identify Reth as the passenger in the car. She also stated that no one from the police department ever asked to see her text messages with Hurley. The first time anyone had asked her for the text messages was when she met with the investigator. She also stated that she "presumed" she

was talking to Hurley, but there were "no phone calls or face to face contact[.]"

(Tr. at 143).

{¶22} On redirect, Hitchcock had the following relevant exchange:

**Q: Okay. You were asked if you had any face to face communications with Jason Hurley. I think your answer was no, there were texts?**

**A: Yes.**

**Q: So you didn't see [Hurley] text, I think was the point Defense Counsel was making, right?**

**A: No, I didn't see him text.**

**Q: But every time you had a text communication with who you believed to be Jason Hurley, he said meet me somewhere to buy an exact amount of drugs for an exact amount of money, he showed up each of the three times, is that right?**

**A: Yep.**

**Q: Each of the three times you had brief communication, you handed him the exact money that was text[ed], and did he hand you the exact amount of drugs that were discussed in the text messages?**

**A: Yes.**

(Tr. at 148-149).

{¶23} The State then proceeded to call Scott Dobransky to testify for the State. Dobransky stated that he is a forensic scientist at the Ohio Bureau of Criminal Identification and Investigation in Bowling Green, Ohio. Dobransky stated that he mainly tests evidence to see whether or not they are a controlled

substance. Dobransky testified that of the five hits of "heroin" bought during the first controlled drug buy, only three were actual heroin and two tested negative for any type of controlled substances. For the second controlled drug buy, Dobransky testified that all five hits tested positive for heroin. For the third controlled drug buy, Dobransky testified that nine of the hits tested positive for heroin, while the other two hits tested negative for any controlled substances.

{¶24} At the close of the State's evidence, Hurley moved for a Crim.R. 29 motion for acquittal for all ten counts. Hurley specifically argued that the State had not met its burden to show that Hurley had control over the automobile used in the first controlled drug buy. Hurley also argued that the State failed to produce any evidence that would connect Hurley with the cell phone. However, the trial court denied Hurley's motion for acquittal. During Hurley's case-in-chief, the following relevant evidence was adduced.

{¶25} Steve Lightner, Hurley's step-father, was the first and only witness to testify for the defense. Lightner explained that Hurley had written him a letter, explaining that his trial counsel would be subpoenaing him to testify at trial. Lightner remembered October 10, 2011, because that was the day Hurley's house got raided by the police. He testified that Hurley was at his house on October 10, 2011, working on a girl's car. Lightner stated that Hurley and the girl showed up

at his house mid-morning that day.  Lightner also admitted that he is a convicted felon but successfully completed his probation.

{¶26} On cross-examination, Lightner stated that he spoke to an investigator from the Hardin County Prosecutor's Office.  The investigator issued him a *subpoena duces tecum* to bring Hurley's letter with him to the trial.  Lightner testified that he did not bring the letter to court because he threw the letter away, which is what he told the investigator when he was given the subpoena.  Lightner also could not identify the girl Hurley was with on October 10, 2011.

{¶27} After Lightner testified, the defense rested its case.  Both the State and Hurley offered their closing statements and the trial court charged the jury before deliberations.

{¶28} The jury returned a guilty verdict on all 10 counts.  This matter then proceeded to sentencing that same day.  The State addressed the issue of allied offenses.  The State recommended proceeding to sentencing only on counts two (possession of criminal tools), three (trafficking in heroin), six (trafficking in heroin), eight (trafficking in heroin), and ten (possession of criminal tools).  The State articulated its position that the trafficking in counterfeit controlled substances were allied offenses with the trafficking in heroin charges, and that the possession charges merged with the trafficking charges.  Hurley argued that the

counts of possession of criminal tools should be merged with his trafficking counts.

**{¶29}** The defendant then spoke and stated that he moved to Texas, remarried, and has a job there. Hurley also explained that he has a child on the way and "[o]nce released, I'll be leaving the State of Ohio and going back to Texas, and [will] work back in the oil field." (Tr. at 283).

**{¶30}** The trial court then merged Hurley's allied offenses and proceeded to sentence him on counts two, three, six, eight, and 10. The trial court then made the following relevant findings:

> **Trial Court: * * * [T]he Court finds that because of your past history, Mr. Hurley, and most specifically for the reason that you were released from prison in June of '11, and the conduct with which you're now convicted took place in September and October of '11 – not even six months later, the Court's going to find that you are not amenable to anything we have to offer here in Hardin County; that prison sentences are appropriate for your conduct; and therefore that [sic] even though they are F5s, because of your extensive past felony record, that you should be sent to prison. * * * The Court finds, though, that consecutive sentences between the three incident dates is [sic] appropriate because of your past history, because of your failure to right your conduct * * *.**

(Tr. at 284-286).

**{¶31}** The trial court sentenced Hurley to two 10 month prison terms for counts two and 10 (possession of criminal tools) to be run concurrently with two 12 month prison terms for count three and eight (trafficking in heroin). It then

-14-

sentenced Hurley to another 12 month prison term for count six (trafficking in heroin), with counts three, six, and eight running consecutively for an aggregate prison sentence of 36 months.

{¶32} Hurley timely appealed this judgment, presenting the following assignments of error for our review.

### Assignment of Error No. I

**THE TRIAL COURT ERRED WHEN IT ACCEPTED THE JURY'S GUILTY VERDICT WHICH WAS CLEARLY AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND WAS NOT BASED UPON SUFFICIENT EVIDENCE.**

### Assignment of Error No. II

**THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO MERGE THE CRIMINAL TOOLS CONVICTIONS WITH THE TRAFFICKING HEROIN CONVICTIONS AT SENTENCING.**

### Assignment of Error No. III

**THE TRIAL COURT ERRED WHEN IT IMPOSED THE MAXIMUM SENTENCES [SIC] IN THREE COUNTS, AND BY RUNNING THOSE THREE COUNTS CONSECUTIVE TO EACH OTHER.**

### Assignment of Error No. I

{¶33} In his first assignment of error, Hurley argues that the trial court erred when it accepted the jury's guilty verdict because there was insufficient evidence and because it was against the manifest weight of the evidence. We agree in part and disagree in part.

*Insufficient Evidence*

**{¶34}** Crim.R. 29(A) provides that a court must order the entry of a judgment of acquittal of a charged offense "if the evidence is insufficient to sustain a conviction of such offense[.]" However, "a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman,* 55 Ohio St.2d 261 (1978), syllabus. Thus, a motion for acquittal tests the sufficiency of the evidence. *State v. Tatum,* 3d Dist. Seneca No. 13–10–18, 2011–Ohio–3005, ¶ 43, citing *State v. Miley,* 114 Ohio App.3d 738, 742 (4th Dist.1996).

**{¶35}** When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe,* 105 Ohio St.3d 384, 2005–Ohio–2282, ¶ 47. Sufficiency is a test of adequacy. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith,* 80 Ohio St.3d 89 (1997). Accordingly, the question of whether the offered evidence is sufficient to sustain a verdict is a question of law. *State v. Wingate*, 9th Dist. Summit No. 26433, 2013-Ohio-2079, ¶ 4.

{¶36} In order to preserve the issue of sufficiency on appeal, this court has held that "[w]hen a defendant moves for acquittal at the close of the state's evidence and that motion is denied, the defendant waives any error which might have occurred in overruling the motion by proceeding to introduce evidence in his or her defense. In order to preserve a sufficiency of the evidence challenge on appeal once a defendant elects to present evidence on his behalf, the defendant must renew his Crim.R. 29 motion at the close of all the evidence." (Citation omitted.) *State v. Edwards,* 3d Dist. Marion No. 9–03–63, 2004–Ohio–4015, ¶ 6.

{¶37} The record reveals that Hurley made his Crim.R. 29 motion at the close of the State's case-in-chief, and that the trial court denied his motion for acquittal. Thereafter, Hurley proceeded to present evidence in his defense. Hurley, however, did not renew his Crim.R. 29 motion at close of his case-in-chief or at the conclusion of the all the evidence. Thus, according to this court's precedent, Hurley has waived all but plain error. *State v. Flory,* 3d Dist. Van Wert No. 15–04–18, 2005–Ohio–2251, citing *Edwards.*

{¶38} However, "[w]hether a sufficiency of the evidence argument is reviewed under a prejudicial error standard or under a plain error standard is academic." *Perrysburg v. Miller,* 153 Ohio App.3d 665, 2003–Ohio–4221, ¶ 57 (6th Dist.), quoting *State v. Brown,* 2d Dist. Montgomery No. 17891 (July 14, 2000). Regardless of the standard used, "a conviction based on legally insufficient

evidence constitutes a denial of due process, and constitutes a manifest injustice." (Citation omitted.) *Thompkins,* 78 Ohio St.3d at 386–87. Accordingly, we will proceed to determine whether the State presented sufficient evidence to support Hurley's conviction.

### *R.C. 2923.24(A)*

{¶39} Hurley was charged with two counts of possession of criminal tools in violation of R.C. 2923.24(A), which states that "[n]o person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally." Further, possession is defined as "a voluntary act if the possessor knowingly procured or received the thing possessed, or was aware of the possessor's control of the thing possessed for a sufficient time to have ended possession." R.C. 2901.21(D)(1). A person may be in actual or constructive possession of an object. *State v. Smith*, 92 Ohio App.3d 172, 175 (8th Dist. 1993). An individual has constructive possession when there is evidence that the individual was able to exercise dominion and control over the object. *State v. Stewart*, 3d Dist. Seneca No. 13-08-18, 2009-Ohio-3411, ¶ 43.

{¶40} Here, the State contends that Hurley possessed a criminal tool on September 28, 2011 and on October 10, 2011. Specifically, the State argues that Hurley possessed either a car and/or cell phone that were used to facilitate the drug

transactions. We find that the State presented sufficient evidence to convict Hurley of possession of criminal tools, specifically a cell phone.

{¶41} Testimony at trial revealed that the confidential informant set up the purchases of heroin from Hurley through text messaging. Detective Beach testified to the following regarding Hurley's use of a cell phone for the September 28, 2011 drug buy.

> **STATE: How were those terms communicated between Mr. Hurley and the informant?**
>
> **DETECTIVE BEACH: They were using a cell phone texting back and forth.**
>
> **STATE: Okay. To help set up the buy?**
>
> **DETECTIVE BEACH: Yes.**
>
> **STATE: Do you have copies of those texts?**
>
> **DETECTIVE BEACH: No.**
>
> **STATE: Could you explain why?**
>
> **DETECTIVE BEACH: We don't do that in order to, we try to help preserve the CI, not getting their phone number out there.**
>
> **STATE: So you do that as a safety measure?**
>
> **DETECTIVE BEACH: Yes.**
>
> **STATE: Okay. Did the cell phone help facilitate the buy or the trafficking in controlled substance?**
>
> **DETECTIVE BEACH: Yes.**

Case No. 6-13-02

(Tr. at 18-19).

{¶42} Detective Beach then testified as follows regarding Hurley's use of a

cell phone for the October 10, 2011, controlled drug buy.

> **STATE:  And was there a third controlled drug buy conducted by your team?**
>
> **DETECTIVE BEACH:  Yes there was.**
>
> **STATE:  And what was the nature of that buy?**
>
> **DETECTIVE BEACH:  We were gonna be purchasing eleven hits of heroin for two hundred dollars off of Jason Hurley.**
>
> **\* \* \***
>
> **STATE:  Tell us what happened before this drug buy.**
>
> **DETECTIVE BEACH:  It was arranged from the CI to Jason through phone, text, and call to purchase the amount of heroin from him.**

(Tr. at 70).

{¶43} The confidential informant, Hitchcock, also testified at trial that she

set up the amount of the drug transactions, the money involved, and where to meet

with Hurley to conduct the transactions through text messaging between her and

Hurley.  Regarding setting up the September 28, 2011 transaction the following

testimony was introduced.

> **STATE:  Okay.  And when you say talked, who do you mean you spoke with?**
>
> **HITCHCOCK:  Text messaging Jason [Hurley].**

**STATE:  Okay.  And would I assume that was on a phone of some sort?**

**HITCHCOCK:  Yes.**

(Tr. at 130).

**{¶44}** Regarding the October 4, 2011, controlled buy incident (not subject to a criminal tools charge), the following testimony was introduced.

**STATE:  Could you tell the jurors what happened on the second buy when you got to that residence?**

**HITCHCOCK:  I went in his apartment.  * * *  He had the heroin in his garage, and we went to his garage and he gave me what I bought from him * * *[.]**

**\* \* \***

**STATE:  How much money were you given by law enforcement to purchase drugs from Mr. Hurley that day, if you recall?**

**HITCHCOCK:  I believe it was a hundred.**

**STATE:  And what were you to purchase?**

**HITCHCOCK:  Heroin.**

**STATE:  And how much?**

**HITCHCOCK:  Five.**

**STATE:  Was that the same terms that were discussed on text messages with Mr. Hurley?**

**HITCHCOCK:  Yes.**

**STATE:  And the location to have that occur, did he tell you where to go?**

**HITCHCOCK:  Yes.**

**STATE:  And where did he tell you to go?**

**HITCHCOCK:  To his house.**

(Tr. at 132-134).

**{¶45}** Regarding the October 10, 2011, incident, the following testimony was presented regarding cell phones.

**STATE:  You indicated earlier that you were back at the same residence where Mr. Hurley resides on October 10th, 2011, and was that for another drug buy?**

**HITCHCOCK: Yes.**

**STATE:  Could you tell us how this drug buy was set up?**

**HITCHCOCK:  Text message.**

**STATE:  Okay.  Between whom?**

**HITCHCOCK:  Me and Jason.**

**STATE:  Okay.  What were the terms of the deal?**

**HITCHCOCK:  That I went to his house and bought some.**

**STATE:  Do you remember how much?**

**HITCHCOCK:  On the third time?**

**STATE:  Yes.**

**HITCHCOCK:  Eleven for two hundred.**

-22-

\* \* \*

STATE:  Can you tell us what happened when you approached Jason's house on October 10th of 2011?

HITCHCOCK:  \* \* \* I went in and gave Jason the money, and he gave me the heroin, and I left.

STATE:  Okay.  For the record, how much money did you give Jason Hurley that day?

HITCHCOCK:  Two hundred dollars.

STATE:  And how much heroin did he give you?

HITCHCOCK:  He gave me eleven.

(Tr. at 135-137).

{¶46} After Hitchcock was cross-examined the State presented the following testimony on re-direct.

STATE:  Okay.  You were asked if you had any face to face communications with Jason Hurley.  I think your answer was no, there were texts?

HITCHCOCK:  Yes.

STATE:  So you didn't see Jason text, I think was the point Defense Counsel was making, right?

HITCHCOCK:  No, I didn't see him text.

STATE:  But every time you had a text communication with who you believed to be Jason Hurley, he said meet me somewhere to buy an exact amount of drugs for an exact amount of money, he showed up each of the three times, is that right?

-23-

**HITCHCOCK: Yep.**

**STATE: Each of the three times you had brief communication, you handed him the exact money that was text, and did he hand you the exact amount of drugs that were discussed in the text messages?**

**HITCHCOCK: Yes.**

(Tr. at 148-149).

{¶47} While we acknowledge that the State did not introduce Hurley's cell phone or his cell phone records, both of which would have been helpful, there was clear uncontroverted testimony that Hitchcock was text messaging another cell phone to set up the details of a transaction with Hurley—a transaction that proceeded with Hurley precisely as the messaging indicated it would. Accordingly, we cannot find that under the facts and circumstances of this case that there was insufficient evidence to convict Hurley for possession of criminal tools, specifically, a cell phone in both the September 28, 2011 incident and the October 10, 2011 incident.[1]

*R.C. 2925.03(A)(1)/R.C. 2925.11(A)*

{¶48} Hurley was also charged with three counts of trafficking in heroin and three counts of possession of heroin in violation of R.C. 2925.03(A)(1) and 2925.11(A) respectively. R.C. 2925.03(A)(1), states, in relevant part:

---

[1] As we do not find that there was insufficient evidence to convict Hurley regarding the cell phone as a criminal tool in both counts, we do not find it necessary to analyze the State's alternative argument as to whether the car was also a criminal tool.

**(A) No person shall knowingly do any of the following:**

**(1) Sell or offer to sell a controlled substance or a controlled substance analog[.]**

Further, R.C. 2925.11(A) states "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog."

**{¶49}** After reviewing the record, we find there was sufficient evidence to overcome Hurley's motion for acquittal on the trafficking in heroin and possession of heroin.

**{¶50}** Hitchcock testified that she had bought heroin from Hurley before. Testimony was elicited from Hitchcock that Hurley was the person who gave her the hits of heroin on September 28, October 4, and October 10. She also testified that Hurley was the person she gave the money to on those same dates. Thus, there was evidence presented that Hurley sold Hitchcock heroin on three separate occasions. Further, Hurley's voice, as identified by Detective Beach, is on the wire of each of the three controlled drug buys. Detective Beach also testified that Hitchcock was searched[2] before and after the drug buys and no contraband was ever found on her person.

**{¶51}** We therefore find that the State presented sufficient evidence to convict Hurley of trafficking in heroin and possession of heroin.

---

[2] We acknowledge Hurley's argument that Hitchcock was not thoroughly searched because there was no female officer to do so, and we do not endorse that failure. However, the jury was still entitled to weigh Hitchcock's credibility as to having received the drugs from Hurley.

*R.C. 2925.37(B)*

**{¶52}** Hurley was also charged with two counts of trafficking in counterfeit controlled substances in violation of R.C. 2925.37(B), which states "[n]o person shall knowingly make, sell, offer to sell, or deliver any substance that *the person knows* is a counterfeit controlled substance." (Emphasis added.) Further, "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

**{¶53}** Here, we find that the State provided insufficient evidence to convict Hurley of trafficking in counterfeit controlled substances. The statute at issue requires actual knowledge that the substance was counterfeit, and in this case there was simply no evidence presented from which a trier of fact could find or infer that Hurley *knew* that some of the heroin he sold to Hitchcock was not actually heroin. Knowledge of the counterfeit nature of a substance can be shown when there is some sort of admission by the defendant. *See State v. Oliver*, 9th Dist. Summit No. 24500, 2009-Ohio-2680, ¶ 28 (sufficient evidence to convict defendant of trafficking a counterfeit controlled substance when defendant admitted to police officers that the substance found in his coat pocket was "fake" crack); *see also State v. Peterson*, 8th Dist. Cuyahoga No. 56966, 1990 WL

84325, * 1 (Jun. 21, 1990) (officer testified that the defendant admitted to him that the substance in the plastic baggies was vitamin B, not crack cocaine). Knowledge also could have potentially been shown via circumstantial evidence such as testimony that Hurley packaged the drugs himself. However, beyond the mere fact that some of the substances sold ultimately proved not to be heroin, there was simply no direct or circumstantial evidence presented from which a jury could infer that Hurley knew that some of the hits he sold to Hitchcock were counterfeit.

{¶54} Therefore, the State failed to establish that Hurley *knowingly* sold counterfeit controlled substances.

*Manifest Weight*

{¶55} When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *Thompkins*, 78 Ohio St.3d at 387. Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1989). When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the

evidence "weighs heavily against the conviction." *Id*. at paragraph three of the syllabus.

{¶56} Since there was insufficient evidence presented to convict Hurley of trafficking counterfeit controlled substances, we will only analyze whether Hurley's convictions for possession of criminal tools, trafficking in heroin and possession of heroin were against the manifest weight of the evidence.

*Trafficking in Heroin and Possession of Heroin*

{¶57} Hurley's step-father testified for the defense and provided an alibi for Hurley on October 10, 2011, which conflicted with Hitchcock's testimony that Hurley was at his residence and sold her drugs. "It is well-established that when conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony." *State v. Bates*, 12th Dist. Butler No. CA2009-06-174, 2010-Ohio-1723, ¶ 11. It is also well-established that the credibility of witnesses is primarily an issue for the trier of fact. *State v. Payne*, 3d Dist. Hancock No. 5-04-21, 2004-Ohio-6487, ¶ 15; *see also Ardrey v. Ardrey*, 3d Dist. Union No. 14-03-41, 2004-Ohio-2471, ¶ 17. Accordingly, this court must afford the decision of the trier of fact the appropriate deference when considering such credibility issues. We will not substitute our judgment for that of the trier of fact on the issue of witness credibility unless it is patently clear that the fact finder lost its way. *Payne* at ¶ 15;

see also *State v. Parks*, 3d Dist. Van Wert No. 15-03-16, 2004-Ohio-4023, ¶ 13, citing *State v. Twitty*, 2d Dist. Montgomery No. 18749, 2002-Ohio-5595, ¶ 44.

{¶58} In addition to Hitchcock's testimony, the State offered the wire recordings into evidence and Detective Beach testified that he could identify Hurley's voice on each of these recordings. If the jury accepted Detective Beach's testimony as true, that would be sufficient evidence that Hurley was present at each controlled drug buy. Therefore, looking at all the evidence before us, we cannot say the trier of fact lost its way and created such a manifest miscarriage of justice that Hurley's convictions of trafficking in heroin and possession of heroin must be reversed and a new trial ordered. The trier of fact was in the best position to hear all the witnesses' testimony, observe the witnesses, and determine their reliability.

*Possession of Criminal Tools*

{¶59} The State presented uncontroverted testimony that the drug transactions were set up through text messaging. The argument that no one saw Hurley actually text messaging Hitchcock to set up the transaction only raises a possible doubt, not a reasonable doubt under the circumstances where the transaction was arranged with someone Hitchcock believed to be Hurley and, in fact, Hurley followed through with the exact details established for the

transactions from the text messages. Thus we cannot find there was any manifest miscarriage of justice.

{¶60} Accordingly, after reviewing the evidence we sustain Hurley's first assignment of error in part to the extent that we find that there was insufficient evidence to convict him of trafficking in counterfeit controlled substances. All other aspects of Hurley's first assignment of error are overruled.

### Assignment of Error No. II

{¶61} In his second assignment of error, Hurley argues that the trial court erred by failing to merge his possession of criminal tools convictions with his trafficking convictions at sentencing. Specifically, Hurley contends that his cell phone only became a criminal tool once it was used to make the offer to sell heroin to Hitchcock and that therefore the offenses were allied.

{¶62} Whether offenses are allied offenses of similar import is a question of law that this Court reviews *de novo*. *State v. Stall,* 3d Dist. Crawford No. 3–10–12, 2011–Ohio–5733, ¶ 15, citing *State v. Brown,* 3d Dist. Allen No. 1–10–31, 2011–Ohio–1461, ¶ 36. Revised Code 2941.25, Ohio's multiple-count statute, states:

> **(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**

**(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

{¶63} In *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, the Supreme Court of Ohio modified the analysis for determining whether offenses are allied offenses of similar import under R.C. 2941.25. "In *Johnson* the Supreme Court revised the allied offenses analysis by removing the first step of the analysis, which had required trial courts to compare the elements of the charged offenses in the abstract." *State v. Helmbright*, 10th Dist. Franklin Nos. 11AP-1080, 11AP-1081, 2013-Ohio-1143, ¶ 33. Now, according to *Johnson*, a court must first determine whether it is possible to commit both offenses with the same conduct. *Johnson* at ¶ 48. "If the multiple offenses can be committed with the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id.* at ¶ 49, quoting *State v. Brown,* 119 Ohio St.3d 447, 2008–Ohio–4569, ¶ 50 (Lanzinger, J., dissenting). If it is possible to commit the offenses with the same conduct and the defendant did, in fact, commit the multiple offenses with the same conduct, then the offenses are allied offenses of similar import and will merge. *Id.* at ¶ 50.

{¶64} However, "if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then according to R.C. 2941.25(B), the offenses will not merge." *Id.* at ¶ 51. "The defendant bears the burden to prove entitlement to merger." *State v. Forney*, 2d Dist. Champaign No. 2012-CA-36, 2013-Ohio-3458, ¶ 10, citing *State v. Jackson,* 2d Dist. Montgomery No. 24430, 2012–Ohio–2335, ¶ 134.

{¶65} In *State v. Dammons*, 8th Dist. Cuyahoga No. 94878, 2011-Ohio-2908, the Eighth District Court of Appeals considered the same question before this court and determined that possession of criminal tools, namely a cell phone, and trafficking in drugs were not allied offenses. *Dammons* at ¶ 24. The Eighth District reasoned,

> **Here, defendant was charged with possessing money and a cell phone "with purpose to use it criminally in the commission of a felony." Accordingly, it was not possible for defendant's possession of these items alone to result in a conviction for either drug trafficking or drug possession. Similarly, his possession of drugs did not establish a possession of criminal tools charge; despite his convictions for drug trafficking and drug possession. E.g., *State v. Byers,* Cuyahoga App. No. 94922, 2011–Ohio–342, ¶ 9 ("The ubiquitousness of cell phones is such that the mere possession of a cell phone is not ipso facto proof that it was used in drug trafficking.")**

*Dammons* at ¶ 24.

{¶66} We agree with the Eighth District and therefore do not find that the trial court erred in failing to merge Hurley's trafficking convictions with his convictions for possession of criminal tools. Accordingly, Hurley's second assignment of error is overruled.

### *Assignment of Error No. III*

{¶67} In his third assignment of error, Hurley argues that the trial court erred by imposing maximum and consecutive sentences. We agree in part and disagree in part.

### *Maximum Sentence*

{¶68} Trial courts have full discretion to impose any sentence within the statutory range. *State v. Saldana*, 3d Dist. Putnam No. 12-12-09, 2013-Ohio-1122, ¶ 20. Since Hurley was convicted of fifth degree felonies, he could be sentenced to prison anywhere between six and twelve months. R.C. 2929.14(A)(5). "A trial court's sentence will not be disturbed on appeal absent a defendant's showing by clear and convincing evidence that the sentence is unsupported by the record or otherwise contrary to law." *State v. Barrera*, 3d Dist. Putnam No. 12-12-01, 2012-Ohio-3196, ¶ 20. Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. An appellate court should not, however, substitute its judgment for that

of the trial court because the trial court is in a better position to judge the defendant's chances of recidivism and determine the effects of the crime on the victim. *State v. Watkins*, 3d Dist. Auglaize No. 2-04-08, 2004-Ohio-4809, ¶ 16.

{¶69} R.C. Chapter 2929 governs sentencing. When sentencing a felony offender, the trial court must consider R.C. 2929.11, which sets forth the overriding purposes of felony sentencing. In advancing these purposes, sentencing courts are instructed to "consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." R.C. 2929.11(A). Further, R.C. 2929.11(B) requires that felony sentences not demean "the seriousness of the offender's conduct and its impact upon the victim" and be consistent with sentences imposed in similar cases. *State v. Snyder*, 3d Dist. Seneca No. 13-12-38, 2013-Ohio-2046, ¶ 24.

{¶70} The trial court must also consider the factors set forth under R.C. 2929.12(B), (C), (D), and (E) relating to the seriousness of the offender's conduct and the likelihood of the offender's recidivism, and "may consider any other factors that are relevant to achieving those purposes and principles of sentencing." *State v. Hartley*, 3d Dist. Union No. 14-11-29, 2012-Ohio-4108, ¶ 31; R.C. 2929.12(A).

**{¶71}** The Ohio Revised Code does not mandate that the sentencing judge use specific language or make specific findings on the record when considering the applicable seriousness and recidivism factors. *State v. Arnett*, 88 Ohio St. 3d 208, 215 (2000); R.C. 2929.12. Where the record lacks sufficient reasons to justify the trial court's sentence, the reviewing court may find that the trial court erred. *State v. Hobby*, 5th Dist. Ashland No. 11COA41, 2012-Ohio-2420, ¶ 36. However, where the record supports the sentence, the trial court does not need to recite its reasoning on the record. *Id.*

**{¶72}** Here, since Hurley was convicted of violating R.C. 2925.03(A)(1),(C)(6)(a), division (B) of section 2929.13 applies. R.C. 2929.13(B) states, in relevant part, that:

> **(b) The court has discretion to impose a prison term upon an offender who is convicted or pleads guilty to a felony of the fourth or fifth degree that is not an offense of violence * * * if any of the following apply:**
>
> **\* \* \***
>
> **(x) The offender at the time of the offense was serving, or the offender previously had served, a prison term.**

R.C. 2929.13(B)(1)(b)(x). Since it is undisputed that Hurley has previously served a prison term, the trial court did not err in sentencing Hurley to a prison term.

**{¶73}** However, Hurley argues that the trial court erred in imposing the maximum sentence because the trial court failed to consider the statutory

-35-

sentencing factors. Specifically, Hurley argues that because the trial court did not state, at the sentencing hearing, that it considered the sentencing factors in R.C. 2929.11 and 2929.12, it abused its discretion. After a review of the record, Hurley is correct in stating that the trial court did not explicitly mention R.C. 2929.11 or 2929.12 during the sentencing hearing. However, the trial court explicitly considered these factors in its judgment entry. Further, the trial court did state that Hurley had an extensive felony record, R.C. 2929.12(D)(2), and that these offenses happened in a short period of time after being released from prison for a different felony conviction, R.C. 2929.12(D)(3). Therefore, it is apparent, from the sentencing hearing transcript and from the judgment entry, that the trial court adequately considered the appropriate sentencing factors.

*Consecutive Sentences*

{¶74} The revisions to the felony sentencing statutes under H.B. 86 now require a trial court to make specific findings on the record, as set forth in R.C. 2929.14(C)(4), when imposing consecutive sentences. *State v. Hites*, 3d Dist. Hardin No. 6-11-07, 2012-Ohio-1892, ¶ 11. Specifically, the trial court must find that (1) consecutive sentences are necessary to either protect the public or punish the offender; (2) the sentences would not be disproportionate to the offense committed; and (3) one of the factors set forth in R.C. 2929.14(C)(4)(a, b or c) applies. *Id.*

**{¶75}** Here, the trial court did not state that it considered the factors set forth in R.C. 2929.14 and also did not make all three statutory findings that are required by R.C. 2929.14(C). In regard to consecutive sentences the trial court stated:

> **The Court finds, though, that consecutive sentences between the three incident dates is appropriate because of your past history, because of your failure to right your conduct, so it's going to be the order of the Court that the twelve month prison term between counts two and three run consecutive to the twelve month prison term for count six, which also will run consecutively for the twelve month prison term for the two consecutive charges of count eight and ten, for a non-mandatory aggregate prison term of thirty six months.**

(Trial and Sentencing Tr., p. 286). While, the trial court made the appropriate finding under R.C. 2929.14(C)(4)(c), it did not make the other two necessary findings.

**{¶76}** We note that the trial court made the proper findings in its sentencing judgment entry. (Docket No. 61, p. 8). However, Crim.R. 32(C) requires that at the time of imposing a sentence, the court shall "[i]n serious offenses, state its statutory findings and give reasons support those findings, if appropriate." Therefore, it was necessary for the trial court to make the appropriate findings under R.C. 2929.14(C) at the sentencing hearing. *See State v. Billenstein*, 3d Dist. Mercer No. 10-13-10, 2014-Ohio-255, fn. 3 (finding that while the trial court made the appropriate findings under R.C. 2929.14(C) in its journal entry, the trial

-37-

court was required to make these findings at the sentencing hearing in front of the defendant); *State v. Brooks*, 9th Dist. Summit Nos. 26437, 26352, 2013-Ohio-2169, ¶ 13 ("[T]his court concludes that [R.C. 2929.14(C)'s] findings must be made at the sentencing hearing on the record. * * * Ideally, those findings would also then be memorialized in the sentencing entry."); *State v. Davis*, 8th Dist. Cuyahoga County Nos. 97689, 97691, and 79692, 2012-Ohio-3951, ¶ 8 ("Under R.C. 2929.14(C)(4), the trial court must state its findings in support of consecutive sentences on the record *at the sentencing hearing*.").  Nor do we believe that actual "findings" of the trial court can be effectuated in any context other than in a judgment entry of the court.  *See State v. Brown*, 3d Dist. Allen No. 1-06-66, 2007-Ohio-1761, ¶ 3 (holding a trial court speaks through its entry, not oral pronouncements); *see also State v. Hankins*, 89 Ohio App.3d 567, 569 (3d Dist.1993) (holding the court has not spoken until its judgment entry is filed).

{¶77} As such, we reverse the trial court's imposition of consecutive sentences and remand this matter so that the trial court can make the proper findings, if they so exist, for the imposition of consecutive sentences.

{¶78} Accordingly, Hurley's third assignment of error is overruled in part and sustained in part.

{¶79} Having found error prejudicial to Hurley in the first and third assignments of error in part, but having found no error prejudicial to Hurley in his

first and third assignment of error in part, or in his second assignment of error, we affirm in part and reverse in part the trial court's judgment and remand this matter for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part, and*
*Cause Remanded*

**WILLAMOWSKI, P.J., concurs.**

**/jlr**

**ROGERS, J. Concurring in Part and Dissenting in Part.**

{¶80} While I concur fully in the majority's disposition of Hurley's first assignment of error in regard to his convictions for possession of heroin, trafficking in heroin, and trafficking in counterfeit controlled substance, and in the disposition of Hurley's third assignment of error, I must respectfully dissent from the opinion of the majority regarding Hurley's conviction for possession of criminal tools.

{¶81} I believe that the State provided insufficient evidence at trial to convict Hurley on two counts of possession of criminal tools. I would therefore vacate Hurley's convictions for possession of criminal tools because "a conviction based on legally insufficient evidence constitutes a denial of due process, and constitutes a manifest injustice." (Citation omitted.) *State v. Thompkins,* 78 Ohio

St.3d 380, 386-387 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith,* 80 Ohio St.3d 89 (1997).

{¶82} When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe,* 105 Ohio St.3d 384, 2005–Ohio–2282, ¶ 47. Sufficiency is a test of adequacy. *State v. Thompkins,* 78 Ohio St.3d at 386. Accordingly, the question of whether the offered evidence is sufficient to sustain a verdict is a question of law. *State v. Wingate*, 9th Dist. Summit No. 26433, 2013-Ohio-2079, ¶ 4.

{¶83} To justify a conviction for possession of criminal tools, the majority mistakenly relies on the testimony of Detective Beach, who stated that Hitchcock "set up the purchases of heroin from Hurley through text messaging." Majority Opin., ¶ 41. However, the majority ignores the fact that Detective Beach had *no personal knowledge* of any text messages and it was plain error for the trial court to allow such testimony. Pursuant to Evid.R. 602, "A witness *may not* testify to a matter unless evidence is introduced to support a finding that the witness has *personal knowledge* of the matter. (Emphasis added.) Here, Detective Beach admitted that he never saw Hitchcock text Hurley and never asked to see any of the messages she allegedly sent him or received from him. Thus, the trial court

erroneously allowed Detective Beach to testify to a matter of which he, admittedly, had absolutely no personal knowledge. More disturbing, the majority now relies on this impermissible testimony to support Hurley's conviction.

{¶84} I also find it disconcerting that the State decided not to produce any evidence that Hurley's cell phone existed. The State never offered Hurley's alleged cell phone into evidence nor did Hitchcock testify to Hurley's alleged cell phone number. While the fact that the State did not take pictures of these alleged text messages is not dispositive of this issue, the State could not even be bothered to pull the phone records of Hitchcock and Hurley to show that there was communication between the two parties.

{¶85} Detective Beach explained that the Task Force does not produce copies of the text messages or phone messages between confidential informants and alleged drug dealers as a safety measure. However, in the case sub judice, this is illogical.

> Generally, when the degree of participation of the informant is such that the informant virtually becomes a state's witness, the balance swings in favor of requiring the disclosure of the informant's identify. Conversely, where disclosure would not be helpful or beneficial to the accused, the identity of the informant need not be revealed.

State v. Williams, 4 Ohio St.3d 74, 76 (1983). Here, all three controlled buys took place out of sight from police officers. Therefore, it was inevitable that Hitchcock would have to testify for the State, and her identity would have been revealed,

regardless of whether or not Detective Beach took photographs of her text messages. Indeed, Hitchcock's identity was exposed, as she testified for the State at trial.

{¶86} Further, there was no evidence presented that the person who was "texting" with Hitchcock was Hurley and, more importantly, that Hurley had *possession* of the cell phone. Hitchcock admitted that she "presumed" she was texting with Hurley, but there were "no phone calls or face to face contact * * *[.]" Trial Tr., at p. 143. Hitchcock even admitted at trial that *she did not know with whom she was texting*.

{¶87} The State also presented insufficient evidence to show that Hurley had control over the car he was riding in on September 28, 2011. The State argues that Hurley used the vehicle to conceal the drug transaction, which shows that it was used for a criminal purpose. While I agree that there might have been a criminal purpose behind using the car, the State did not present any evidence that Hurley controlled the car.

{¶88} Detective Beach testified that Collins was driving the car on September 28, 2011 and that the car's registered owner, Reth, was sitting in the passenger seat. While the State did not need to present evidence that Hurley owned the car, it at least had to present evidence that Hurley had control over the car. The State did not produce a witness that testified Hurley directed Collins or

Reth to drive to Hitchcock's apartment. Simply being a passenger in the car does not amount to dominion or control over the car. *See State v. McShan*, 77 Ohio App.3d 781, 783-784 (8th Dist.1991) (State's evidence was insufficient to show defendant constructively possessed a car when he was sitting in the passenger seat); *State v. Thompson*, 8th Dist. Cuyahoga Nos. 58803, 58834, 1991 WL 144337, *4 ("Based on our earlier discussion of 'possession,' it is clear that [the driver] had possession of the car. The same cannot be said for [the defendant] as a passenger."). Therefore, the State also produced insufficient evidence to demonstrate that Hurley had control over the car in which he was a passenger.

{¶89} For the aforementioned reasons, I believe the State presented insufficient evidence to demonstrate that Hurley possessed a criminal tool. Accordingly, I would sustain Hurley's first assignment of error insofar as it relates to his convictions for possession of criminal tools. As a result, I would decline to consider his second assignment of error as being moot.