[Cite as *State v. Houdeshell*, 2018-Ohio-5217.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,             CASE NO. 5-18-02

     v.

BRENT R. HOUDESHELL,           O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Hancock County Common Pleas Court
Trial Court No. 2016-CR-108

Judgment Affirmed

Date of Decision:   December 26, 2018

APPEARANCES:

    *Adam Lee Nemann* for Appellant

    *Phillip A. Riegle and Colleen P. Limerick* for Appellee

**ZIMMERMAN, J.**

{¶1} Defendant-appellant, Brent R. Houdeshell ("Houdeshell"), appeals the January 26, 2018 judgment entry of sentence of the Hancock County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case stems from the March 31, 2016 death of B.F., the minor child of Alisha Young ("Young"). Houdeshell and Young, who were not married, were previously engaged and intermittently lived together with their minor child, Z.H., and Young's children from other relationships, including B.F.

{¶3} On the afternoon of March 31, 2016, B.F. was seen at a hospital emergency room for leg pain. After x-rays and a full-body examination, B.F. was diagnosed with a muscle strain and then discharged. Later that evening, Young and a friend, Alissa Cacy ("Cacy"), left B.F. and Z.H. in Houdeshell's care. At 9:05 p.m., Houdeshell made a 9-1-1 emergency call to report that B.F. had fallen out of his crib and was unresponsive. Later, B.F. was pronounced dead at the hospital. An autopsy revealed multiple injuries to multiple areas of B.F.'s body, including a basilar-skull fracture with a corresponding brain contusion; a spiral-leg fracture; liver, lung, and thymus-gland injuries; and multiple contusions to his face, chest, and extremities.

{¶4} On April 25, 2016, the Hancock County Grand Jury indicted Houdeshell on three counts: Count One of murder in violation of R.C. 2903.02(B),

an unclassified felony; Count Two of endangering children in violation of R.C. 2919.22(B)(1), a second-degree felony; and Count Three of tampering with evidence in violation of R.C. 2921.12(A)(1), a third-degree felony. (Doc. No. 1). On April 27, 2016, Houdeshell appeared for arraignment and entered pleas of not guilty. (Doc. No. 9).

{¶5} The case proceeded to a jury trial on January 8-11 and 16-17, 2018. (*See* Doc. Nos. 194, 197, 198). On January 17, 2018, the jury found Houdeshell guilty of all counts in the indictment. (Doc. Nos. 190, 191, 192, 194, 197, 198).

{¶6} On January 25, 2018, the trial court sentenced Houdeshell to an indeterminate term of life in prison with parole eligibility after serving 15 years on Count One and 24 months in prison on Count Three. (Doc. No. 200). The trial court further ordered that Houdeshell serve the terms consecutively for an aggregate sentence of life in prison with parole eligibility after serving 17 years. (*Id.*).[1] The trial court filed its judgment entry of sentence on January 26, 2018. (*Id.*).

{¶7} Houdeshell filed his notice of appeal on January 29, 2018, and raises three assignments of error for our review. (Doc. No. 205). For ease of our discussion, we will review Houdeshell's second and third assignments of error together, followed by his first assignment of error.

---

[1] The trial court merged Counts One and Two for purposes of sentencing. (Doc. No. 200).

Case No. 5-18-02

**Assignment of Error No. II**

**The Verdicts Were Against the Manifest Weight of the Evidence.**

**Assignment of Error No. III**

**The Evidence Upon Which Appellant's Conviction is Based is Insufficient as a Matter of Law.**

{¶8} In his second and third assignments of error, Houdeshell argues that his convictions are based on insufficient evidence and are against the manifest weight of the evidence.[2] In particular, in his third assignment of error, he argues that the State presented insufficient evidence that he is guilty of murder and endangering children because the "the evidence presented by the state to prove [Houdeshell] was an abuser was absent." (Appellant's Brief at 14). In his second assignment of error, Houdeshell specifically argues that the weight of the evidence shows that he did not abuse B.F., ultimately causing his death.

*Standard of Review*

{¶9} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Therefore, we address each legal concept individually.

{¶10} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at

---

[2] Houdeshell does not challenge his tampering-with-evidence conviction.

trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

{¶11} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387,

quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

*Sufficiency of the Evidence Analysis*

{¶12} As an initial matter, the record reveals that Houdeshell failed to renew his Crim.R. 29(A) motion at the conclusion of his case-in-chief or at the conclusion of all the evidence. (*See* Jan. 16, 2018 Tr. at 1317-1318, 1321, 1462); (Jan. 17, 2018 Tr. at 1472-1511)

> In order to preserve the issue of sufficiency on appeal, this court has held that "[w]hen a defendant moves for acquittal at the close of the state's evidence and that motion is denied, the defendant waives any error which might have occurred in overruling the motion by proceeding to introduce evidence in his or her defense. In order to preserve a sufficiency of the evidence challenge on appeal once a

defendant elects to present evidence on his behalf, the defendant must renew his Crim.R. 29 motion at the close of all the evidence."

*State v. Hurley*, 3d Dist. Hardin No. 6-13-02, 2014-Ohio-2716, ¶ 37, quoting *State v. Edwards*, 3d Dist. Marion No. 9-03-63, 2004-Ohio-4015, ¶ 6. Based on this court's precedent, Houdeshell's failure to renew his Crim.R. 29(A) motion at the conclusion of his case-in-chief or at the conclusion of all evidence waived all but plain error on appeal. *Id.* at ¶ 37, citing *State v. Flory,* 3d Dist. Van Wert No. 15-04-18, 2005-Ohio-2251, ¶ 4, citing *Edwards* at ¶ 7.

{¶13} "However, '[w]hether a sufficiency of the evidence argument is reviewed under a prejudicial error standard or under a plain error standard is academic.'" *Id.* at ¶ 38, citing *Perrysburg v. Miller*, 153 Ohio App.3d 665, 2003-Ohio-4221, ¶ 57 (6th Dist.), quoting *State v. Brown,* 2d Dist. Montgomery No. 17891, 2000 WL 966161, *8 (July 14, 2000). "Regardless of the standard used, 'a conviction based on legally insufficient evidence constitutes a denial of due process, and constitutes a manifest injustice.'" *Id.*, quoting *Thompkins,* 78 Ohio St.3d at 386-87. Accordingly, we will proceed to determine whether the State presented sufficient evidence to support Houdeshell's convictions. *See id. See also State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999).

**{¶14}** Houdeshell was convicted of murder under R.C. 2903.02, which provides, in relevant part, "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." R.C. 2903.02(B). The predicate-felony offense in this case is endangering children under R.C. 2919.22(B)(1), which "provides that no person shall abuse a child under eighteen years of age." *State v. Powe*, 9th Dist. Summit No. 21026, 2002-Ohio-6034, ¶ 27. The culpable-mental state of endangering children under R.C. 2919.22(B) requires the defendant to have acted recklessly. *State v. Troglin*, 3d Dist. Union No. 14-04-41, 2005-Ohio-6562, ¶ 38, fn. 2. *See also State v. Hoffman*, 9th Dist. Summit No. 26084, 2013-Ohio-1021, ¶ 23 ("'[W]hen a defendant is charged with endangering children under [R.C. 2919.22(B)(1)], the State must prove recklessness as an essential element of the offense.'"), quoting *State v. Jones*, 9th Dist. Summit No. 25986, 2012-Ohio-4256, ¶ 6.

> A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

R.C. 2901.22(C). "'Recklessness, like any other essential element of an offense, may be proved through circumstantial evidence.'" *Hoffman* at ¶ 23, quoting *Jones* at ¶ 6.

{¶15} On appeal, Houdeshell argues only that there is insufficient evidence that B.F.'s death was the proximate result of abuse. Because it is the only element that Houdeshell challenges on appeal, we need address only whether the State presented sufficient evidence that Houdeshell abused B.F. and whether B.F.'s death was the proximate result of that abuse.

{¶16} Even though there is no direct evidence that Houdeshell abused B.F., Houdeshell "fails to appreciate that his convictions can be sustained based []on circumstantial evidence." *State v. Crockett*, 10th Dist. Franklin No. 14AP-242, 2015-Ohio-2351, ¶ 38. "'Circumstantial evidence' is the 'proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning or other facts.'" *State v. Lawwill*, 12th Dist. Butler No. CA2007-01-014, 2008-Ohio-3592, ¶ 12, quoting *State v. Wells*, 12th Dist. Warren No. CA2006-02-029, 2007-Ohio-1362, ¶ 11, citing *State v. Griesheimer*, 10th Dist. Franklin No. 05AP-1039, 2007-Ohio-837, ¶ 26. Circumstantial evidence has no less probative value than direct evidence. *Griesheimer* at ¶ 26, citing *Jenks*, 61 Ohio St.3d 259, at paragraph one of the syllabus. *See also State v. Heinish*, 50 Ohio St.3d 231, 238 (1990) ("This court has long held that circumstantial evidence is sufficient to sustain a conviction if that

evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.").

{¶17} Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Houdeshell abused B.F. and that B.F.'s death was the proximate result of that abuse. *Compare State v. Henry*, 10th Dist. Franklin No. 04AP-1061, 2005-Ohio-3931, ¶ 33 (concluding that Henry's felony-murder and endangering-children convictions were based on sufficient evidence because the State presented sufficient circumstantial evidence that Henry abused the child). The record is replete with descriptions of the extent of the injuries that B.F. sustained, which include: a basilar-skull fracture with a corresponding brain contusion; a spiral-leg fracture; liver, lung, and thymus-gland injuries; and numerous contusions to his face, chest, and extremities. (*See, e.g.*, State's Ex. 130).

{¶18} B.F.'s basilar-skull fracture was described as "a very large facture" that went "around the back of the head going into the base of the skull." (Jan. 11, 2018 Tr. at 914-915). Regarding his broken leg, "[h]e had a completely displaced spiral fracture" meaning "the bone is completely broken through and the fragments are no longer in contact." (*Id.* at 1048). (*See* State's Exs. 92, 93). Further, B.F. sustained two lacerations to his liver, which caused "about 300 cc's of blood free in the belly" or "a pretty significant bleed" being "a third of his circulating blood

volume." (Jan. 11, 2018 Tr. at 925-926). B.F. also sustained "a large area of bruising in the back of the right lung" and "an isolated area of bruising" to the right side of his thymus gland. (Jan. 16, 2018 Tr. at 1408, 1410). Finally, B.F.'s numerous contusions were described as indicative of "multiplanar injuries"—meaning "that the injuries lie in separate planes in the body"—which suggest that the injuries were sustained from multiple impacts. (Jan. 11, 2018 Tr. at 1042-1043). (*See also* Jan. 16, 2018 Tr. at 1350-1353). Namely, the bruising to B.F.'s face reflects "at least eight areas of separate bruising and perhaps more." (Jan. 11, 2018 Tr. at 1043). (*See* State's Exs. 58, 59, 94).

{¶19} Notably, this is one of those unique cases in which the State presented *unequivocal* evidence that B.F. could not have sustained any of the injuries described above earlier than 5:41 p.m. on March 31, 2016. That is, B.F. was examined on March 31 by Jennifer Hutton ("Hutton"), a physician assistant working at Blanchard Valley Hospital, for a "left leg injury." (Jan. 9, 2018 Tr. at 476, 482). Other than mild swelling on his left leg, Hutton did not observe any bruises, injuries, or concerns during her physical examination of B.F. Likewise, "no fractures were visualized on the x-ray." (*Id.* at 491). So, B.F. was discharged from the hospital at 5:41 p.m., after being diagnosed with only a "muscle strain." (State's Ex. 4).

{¶20} Further, the evidence presented by the State established that B.F. was in Houdeshell's sole custody when B.F. suffered serious physical harm and

subsequently died. *Compare Henry*, 2005-Ohio-3931, at ¶ 34 (noting that, before he was found dead, the victim "was 'perfect' and in good health" when he was left in Henry's "sole custody"); *State v. Butts*, 10th Dist. Franklin No. 03AP-495, 2004-Ohio-1136, ¶ 29 (noting that the victim suffered injuries while entrusted to Butts's care). Importantly, Young testified that she and Cacy put B.F. to bed in his crib before they left the apartment, and leaving B.F. and Z.H. in Houdeshell's sole custody. Young stated that there were no "marks" on B.F. when she and Cacy left the apartment that evening. (Jan. 9, 2018 Tr. at 415).

{¶21} Dr. Cynthia Beisser ("Dr. Beisser"), a deputy coroner and forensic pathologist with the Lucas County Coroner's Office, Dr. Randall Schlievert ("Dr. Schlievert"), the regional vice president for academic affairs and clinic research at Mercy Health Partners and director of the child-abuse program, and Dr. James Downs ("Dr. Downs"), a forensic pathologist with a special interest in child-abuse cases, testified that B.F.'s injuries were consistent with abuse and not accidental trauma. *Compare State v. Johnson*, 1st Dist. Hamilton No. C-080156, 2009-Ohio-2568, ¶ 70 (concluding that Johnson's endangering-children, felonious-assault, and felony-murder convictions were based on sufficient evidence based on the testimony of medical professionals that the victim's "head injuries were not consistent with accidental trauma"), *rev'd on other grounds*, 128 Ohio St.3d 153, 2010-Ohio-6314; *State v. Cook*, 2d Dist. Montgomery No. 23721, 2010-Ohio-6222,

¶ 23 ("The direct and circumstantial evidence in this case demonstrates that [the victim's] head struck against a hard, flat surface, causing massive brain swelling, and that there is no reasonable possibility that the child's head injuries resulted from an accidental fall, or even two such falls."). Further, Dr. Beisser, Dr. Schlievert, and Dr. Downs agreed that B.F.'s catastrophic-brain injury ultimately caused his death.

{¶22} Dr. Beisser described B.F.'s skull-fracture as "a really significant trauma," the type of trauma that she would expect to see from traffic accidents or "falls from a great height." (Jan. 11, 2018 Tr. at 913, 915-916). *See Johnson* at ¶ 70; *Cook* at ¶ 24. Dr. Schlievert told the jury that B.F.'s skull fracture "is a very severe fracture and the importance of it is its presence is at odds with a fall out of a crib or a household accident." (*Id.* at 1046). He specifically described,

> We do see kids fall out of cribs on beds or fall down stairs, and maybe one or two percent of the time they will get a fracture of the skull and that's usually on the sides which we call the parietal areas. And the factures happen there because that's where the head impact is or it's thinner tissue, it's more likely to break. But in our experience the skull base and occiput are pretty solid, thick bones and the literature that's out there kind of correlates our experience that we see those kind of factures on higher forces than household accidents. * * * I know I have never seen a skull fracture like this from a fall out of a crib or a bed.

(*Id.* at 1046-1047). He also described studies regarding falls of children and concluded that none of the studies reflect the type of injuries that B.F. sustained from falling out of a crib.

**{¶23}** Moreover, Dr. Downs described for the jury that "the injury to the left face had a partial patterned look to it," meaning that there appeared to be a pattern similar to that of carpet imprinted on B.F.'s face. (Jan. 16, 2018 Tr. at 1340). He theorized that

> [a] forceful slam impact of the back of the head into a carpeted surface while someone is grabbing his leg creates enough velocity in the head to cause that head injury and give a very prominent pattern with significant bleeding into it as well as having the additional force on the tibia, that bone in the leg that's broken, to pull it, that would be along its length. So that motion of grabbing him by the leg and slamming him down into the floor onto the carpet easily accounts for those two injuries which are the two major injuries that he got.

(*Id.* at 1360).

**{¶24}** Notwithstanding their concurrence as to B.F.'s cause of death, Dr. Beisser, Dr. Schlievert, and Dr. Downs further agreed B.F.'s spiral-leg fracture was indicative of abuse. In particular, Dr. Schlievert informed the jury, "the displacement severity of facture also go [sic] against a relatively short fall or household injury." (Jan. 11, 2018 Tr. at 1048). Dr. Beisser also indicated that it "would take a good amount of force" to cause the type of leg fracture that B.F. sustained. (*Id.* at 910).

**{¶25}** Further, even though Dr. Beisser, Dr. Schlievert, and Dr. Downs agreed that B.F.'s liver, lung, and thymus-gland injuries are not indicative of abuse on their own, and could be the result of CPR, Dr. Schlievert and Dr. Downs specifically stated that it was their opinion that those injuries were caused by abuse

-14-

based on the totality of the circumstances. Specifically, Dr. Schlievert testified that the presence of the amount of blood found in B.F.'s abdomen from the liver lacerations is "at odds with" his experience and with literature that he has studied. (*Id.* at 1051). Indeed, he testified that, amongst the studies he reviewed "of children who died that had CPR," "none of them had a liver laceration, none of them had blood in their abdomen." (*Id.*). Likewise, Dr. Downs testified that, based on the location of B.F.'s lung and thymus-gland bruises, it is unlikely that those injuries were caused by CPR because they are on the "wrong side" of B.F.'s anatomy. (Jan. 16, 2018 Tr. at 1408).

{¶26} Further, Dr. Schlievert and Dr. Downs testified that at least some of the areas of additional bruising found on B.F.'s body indicate that B.F. was abused. In particular, Dr. Downs hypothesized that the bruising on B.F.'s face could not happen from a single fall or single injury. That is, he testified that the right *and* left sides of B.F.'s face reflect "eight separate discrete injuries," respectively. (*Id.* at 1352-1353). He stated, "You can't fall and hit both sides of your face simultaneously. You can't fall and hit multiple planes, certainly eight on both sides simultaneously, it's physically impossible." (*Id.* at 1353). Rather, he informed the jury that those injuries suggest a "gripping type with a thumb on one side in this case on the right side of the face or under the right side of the chin and fingers extending on the left side." (*Id.* at 1354). Similarly, Dr. Schlievert asserted that the

bruises on B.F.'s face "had the appearance of handprints, a slap mark and there were more than one." (Jan. 11, 2018 Tr. at 1041). In determining that the bruises had the appearance of handprints or a slap mark, Dr. Schlievert described that medical professionals "look for linear rows of the bruising, that's called petechiae, * * * and he's got a series of those where you can actually see one photograph a finger mark on the left side of his face." (*Id.* at 1041-1042). (*See* State's Ex. 57). Dr. Downs also described that bruises on B.F.'s left forearm are "very consistent with a finger or a thumb grabbing that point with significant pressure at that point. It's not a normal finding. It's not something that happens with CPR, that's an injury, a real injury." (Jan. 16, 2018 Tr. at 1369).

{¶27} Dr. Schlievert and Dr. Downs also informed the jury that B.F. had a chromosome disorder, but confirmed that neither the chromosome disorder nor anything else would have made B.F. more susceptible to skull or leg fractures or bruising.

In sum, Dr. Schlievert testified,

It would be foolishness to consider each injury by itself and not put the whole case together. Yes, the forehead bruise he had on the left that could have been from a fall if you take it in isolation, but not when you put everything in context. There's too many injuries of too severe a nature and too many locations to be accounted for by falling out of your crib and hitting your head on the desk and the floor.

(Jan. 11, 2018 Tr. at 1082). Similarly, Dr. Downs summarized that

> [m]ultiple injuries and multiple areas make [him] very strongly suspicious for abuse just generically, but when [he] see[s] these multiple head injuries to every available front, back, right, left, top, bottom even, side of the skull, multiple injuries to the brain, multiple injuries to the upper extremities and lower extremities specifically targeted at vulnerable areas like the feet in [his] opinion that's child abuse.

(Jan. 16, 2018 Tr. at 1413). Accordingly, he concluded that B.F.'s "multiple blunt force injuries were caused by child abuse, they were inflicted" and that those injuries caused B.F. serious physical harm and his death. (*Id.* at 1417-1418).

{¶28} Finally, although the State "'need not prove motive in order to secure a conviction,'" "'the question of motive is generally relevant in all criminal trials.'" *Henry*, 2005-Ohio-3931, at ¶ 42. Here, the State presented evidence that Houdeshell and Young ended their engagement approximately one week prior to B.F.'s death because Houdeshell suspected that Young was not faithful (to him) during their relationship; that Houdeshell "had moved out with his mom"; that Houdeshell was unhappy with Young for leaving B.F. and Z.H. in his care on March 31, 2016 (allowing Young and Cacy to go out) because "he had plans" to go out himself; and that Houdeshell and Young were arguing before Young and Cacy left the apartment. (Jan. 9. 2018 Tr. at 354-355, 359, 378, 381, 466-467).

{¶29} For these reasons, we conclude that a rational trier of fact could have concluded beyond a reasonable doubt that B.F. was abused and that at least one of the abusive-injuries proximately caused his death. That is, the evidence presented

by the State demonstrates that B.F. sustained a catastrophic-brain injury while in Houdeshell's custody and care, which resulted in B.F.'s death, and that B.F.'s head injuries, as well as his other injuries, could not have been caused by the child accidentally falling out of his crib. *See Cook*, 2010-Ohio-6222, at ¶ 34 (concluding that Cook's felony-murder, endangering-children, and felonious-assault convictions were based on sufficient evidence because "[t]he evidence presented by the state, if believed, demonstrates that [the victim] sustained inflicted blunt-force trauma to her head while in defendant's custody and care, which resulted in [the victim's] death, and that [the victim's] head injuries could not have been caused by the child accidentally falling to the ground in a tub or on the playground, as defendant claimed."), citing *State v. King*, 179 Ohio App.3d 1, 2008-Ohio-5363, ¶ 44 (2d Dist.). Therefore, a rational trier of fact could have concluded beyond a reasonable doubt that Houdeshell was the one who abused B.F. *See Henry* at ¶ 43. Accordingly, we conclude that Houdeshell's murder and endangering-children convictions are based on sufficient evidence. *See Cook* at ¶ 27.

*Manifest Weight of the Evidence Analysis*

{¶30} Having concluded that Houdeshell's murder and endangering-children convictions are based on sufficient evidence, we next address whether Houdeshell's murder and endangering-children convictions are against the manifest weight of the evidence. *Velez*, 2014-Ohio-1788, at ¶ 76.

-18-

**{¶31}** In his challenge to the weight of the evidence supporting his murder and endangering-children convictions, Houdeshell contends that the evidence that B.F.'s injuries were caused by an accidental fall is weightier than the evidence that Houdeshell caused B.F.'s injuries by abusing him. Since it is the only element that he challenges, we need address the weight of the evidence supporting only whether Houdeshell abused B.F. "Even removing the lens of favorability in favor of the prosecution, through which we examine the sufficiency of the evidence, this is not an exceptional case where the evidence weighs heavily against the convictions." *State v. Suffel*, 3d Dist. Paulding No. 11-14-05, 2015-Ohio-222, ¶ 33.

**{¶32}** In support of his argument, Houdeshell contends that the weight of the evidence shows that he had no motive to harm B.F. because he was not "upset" with Young; that he was not intoxicated; and that his story remained consistent and was supported by the evidence. (Appellant's Brief at 12-13). As we noted in our sufficiency-of-the-evidence analysis, there is no requirement that the State prove motive to secure a conviction. Accordingly, "[t]he absence of proof of motive does not mean that [Houdeshell's] conviction [is] against the manifest weight of the evidence." *State v. Dukes*, 11th Dist. Trumbull No. 93-T-4903, 1996 WL 200565, *4 (Mar. 22, 1996). Nonetheless, the jury was able to weigh the testimony of two child-abuse-medical experts who described "common stressors or contributing factors that often lead to child abuse." (Jan. 11, 2018 Tr. at 1057-1058); (Jan. 16,

2018 Tr. at 1416). Dr. Downs described the specific stressors that he identified as present in this case as "some domestic issues"; "there was a newborn in the house"; Houdeshell having "a history of * * * shoulder pain, tooth pain"; B.F.'s chromosome disorder as possibly requiring some sort of special care; and "alcohol use." (Jan. 16, 2018 Tr. at 1417). Thus, even absent evidence regarding Houdeshell being angry with Young for leaving him to care for B.F. and Z.H. while she went out with Cacy, the jury was able to weigh the factors outlined by Dr. Downs as stressors that were present that may lead to child abuse.

{¶33} Moreover, even though the first responders on the scene indicated that they did not smell any odor of alcohol on Houdeshell, Young testified that she observed Houdeshell consume "a 24-ounce Mike's Hard Lemonade" before she left the apartment. (Jan. 9, 2018 Tr. at 382). Further, the jury could infer (that Houdeshell consumed alcohol) because Young testified that she sent Houdeshell a text message at 8:41 p.m. asking him "if there was any beer left," to which he responded "no." (*Id.* at 407); (State's Ex. 125). Nevertheless, whether Houdeshell was intoxicated is just one of several factors that, as indicated by Dr. Schlievert and Dr. Downs, child-abuse experts consider in assessing whether a situation precipitated child abuse. As we addressed above, Dr. Downs specifically identified a number of factors that he considered in assessing whether Houdeshell abused B.F.

**{¶34}** Finally, the weight of the evidence convincingly overshadows Houdeshell's argument that his convictions are against the manifest weight of the evidence because "[e]very statement [he] gave to the police was consistent, and supported by the evidence." (Appellant's Brief at 12). Specifically, the jury heard law enforcement recall Houdeshell's various stories describing how B.F. was injured. Further, the jury heard the expert opinions of Dr. Shlievert and Dr. Downs that evolving stories from a caregiver are indicative of child abuse. Indeed, Dr. Schlievert summarized the changes in Houdeshell's story regarding B.F.'s injuries and testified that

> the impact that has on me is changes in history that are significant are one of the red flags for child abuse, where the story doesn't stay consistent. So I do feel that when you hear a report from the same person that, well, he fell, but then later on you're telling the same person that he lunged, that's a key difference.

(Jan. 9, 2018 Tr. at 1037). Similarly, Dr. Downs informed the jury that the record reflects that Houdeshell's story evolved, which indicates to him that Houdeshell abused B.F.

**{¶35}** Likewise, Dr. Beisser, Dr. Schlievert, and Dr. Downs described for the jury how the evidence in the record refutes Houdeshell's stories. In particular, Dr. Beisser, Dr. Schlievert, and Dr. Downs told the jury that B.F. would have been rendered unconscious from the type of brain contusion that he received. Specifically, Dr. Downs stated that B.F. would have been "out of it"; "unconscious";

"not moving"; "a limp rag doll" after sustaining the skull-fracture injury. (Jan. 16, 2018 Tr. at 1394). In other words, "[t]here is no way that he would be eating ice cream [or talking] after sustaining that injury, it simply couldn't happen." (*Id.* at 1395).

{¶36} Further, regarding B.F.'s leg fracture, Dr. Schlievert informed the jury that B.F. "wouldn't have been able to stand. He wouldn't have been able to walk. He would have been in extreme pain." (Jan. 11, 2018 Tr. at 1049). He hypothesized that B.F. would only have been able to be calmed "if someone didn't move it, but any jostling would have been painful, any diaper or pulling pants off and changing them would have been extremely painful because he would have to move his leg." (*Id.* at 1050).

{¶37} Moreover, Dr. Schlievert stated that the record reflects that B.F. previously fell out of his crib and testified that it's interesting that in that fall he really didn't have any serious injuries, he certainly didn't die" and because

> "it was a fall out of the same crib so it just tells you that these falls are relatively innocuous and he's also a clumsy two going on three-year old boy who I suspect has fallen routinely throughout his childhood and did not have a serious injury let alone death from that.

(*Id.* at 1053).

{¶38} In sum, Dr. Beisser testified, "Putting together the totality of the case, the history as given did not seem to match the autopsy findings. The story didn't go along with the injury. So, in those cases one becomes very suspicious of abuse."

(*Id.* at 936). Likewise, Dr. Downs informed the jury "that the history provided was inconsistent with how [B.F.'s] injuries would have been inflicted on him." (Jan. 16, 2018 Tr. at 1340).

**{¶39}** The jury was able to weigh Dr. Beissers's, Dr. Schlievert's, and Dr. Downs's medical opinions as to how B.F. would have reacted in relation to the injuries that he sustained against Houdeshell's stories. As we noted above, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *DeHass*, 10 Ohio St.2d 230 at paragraph one of the syllabus. When making credibility determinations, "[t]he choice * * * rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). The finder of fact is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 44. """A verdict is not against the manifest weight of the evidence because the [jury] chose to believe the State's witnesses rather than the defendant's version of the events."" *Id.*, quoting *State v. Bean*, 9th Dist. Summit No. 26852, 2014-Ohio-908, ¶ 15, quoting *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16.

**{¶40}** After reviewing the entirety of the record, Houdeshell's arguments concerning the evidence are unpersuasive, especially compared to the weighty

evidence against him that we addressed above. Therefore, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that Houdeshell's convictions must be reversed and a new trial ordered.

**{¶41}** Therefore, Houdeshell's second and third assignments of error are overruled.

### Assignment of Error No. I

**The Trial Court Erred in Admitting the Testimony of Alissa Cacy, After the Witness Purposely Violated the Court's Earlier Instruction Not to Testify Regarding Mr. Houdeshell's Intent to Purchase Illegal Drugs, and In So Doing Allowed the Prosecution to Proffer Unfairly Prejudicial Testimony and As Such the Trial Court Abused its Discretion by Not Declaring a Mistrial.**

**{¶42}** In his first assignment of error, Houdeshell argues that the trial court erred by denying his motion for a mistrial based on Cacy's unfairly prejudicial testimony regarding Houdeshell's intention to buy drugs.

*Standard of Review*

**{¶43}** "'A mistrial should not be ordered in a cause simply because some error has intervened. The error must prejudicially affect the merits of the case and the substantial rights of one or both of the parties.'" *State v. Sipple*, 10th Dist. Franklin No. 17AP-862, 2018-Ohio-4342, ¶ 18, quoting *Tingue v. State*, 90 Ohio St. 368 (1914), paragraph three of the syllabus. "Notably, mistrials are appropriate only when the ends of justice so require and a fair trial is no longer possible." *State*

*v. Carter*, 3d Dist. Allen No. 1-15-62, 2017-Ohio-1233, ¶ 61, citing *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991).

{¶44} Because it rests within the sound discretion of the court, we review a trial court's grant or denial of a motion for a mistrial for an abuse of discretion. *Id.*, citing *State v. Garner*, 74 Ohio St.3d 49, 59 (1995). An abuse of discretion implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

*Analysis*

{¶45} In this case, Houdeshell's mistrial argument focuses on the prejudicial impact of Cacy's testimony—that is, Houdeshell contends that he was prejudiced by the disclosure of his intent to buy drugs as his reason for arguing with Young about staying at the apartment with B.F. and Z.H.

{¶46} In general, relevant evidence is *not* admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A). "Evid.R. 403(A) does not 'attempt to bar all prejudicial evidence.'" *State v. Scurlock*, 6th Dist. Lucas No. L-5-1200, 2017-Ohio-1219, ¶ 32, quoting *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 23. "Instead, the rule provides that only *unfairly* prejudicial evidence is excludable." (Emphasis sic.) *Id.*, citing *Crotts* at ¶ 23.

> "'Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence

arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.'"

*Crotts* at ¶ 24, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 171 (2001), quoting Weissenberger, *Ohio Evidence*, Section 403.3, at 85-87 (2000). *See also Velez,* 2014-Ohio-1788, at ¶ 122, quoting *State v. Calhoun*, 11th Dist. Ashtabula No. 2010-A-0057, 2012-Ohio-1128, ¶ 82.

{¶47} "In a criminal case in which a defendant-appellant alleges that it was reversible error to allow the trier of fact to hear certain testimony, the reviewing court must first determine if it was error to allow the trier of fact to hear the testimony and, if so, whether such error was prejudicial or harmless." *State v. Walker*, 8th Dist. Cuyahoga No. 87968, 2007-Ohio-3772, ¶ 19, citing *State v. Benton*, 8th Dist. Cuyahoga No. 82810, 2004-Ohio-3116, ¶ 42, citing *State v. Davis,* 44 Ohio App.2d 335 (8th Dist.1975), paragraph three of the syllabus. *See State v. Randolph*, 3d Dist. Seneca No. 13-81-31, 1983 WL 7256, *2 (May 11, 1983), quoting *Davis* at paragraph three of the syllabus. *See also State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, syllabus; R.C. 2953.83(C).

{¶48} During the State's direct examination of Cacy, the following exchange took place:

[The State]: Okay. Then did you overhear any discussion between Alisha and Brent regarding going out, the two of you going out that evening?

-26-

> [Cacy]:        Yeah.
>
> [The State]:   Okay.  What did you hear from Brent?
>
> [Cacy]:        He wanted to go out and get Coke.

(Jan. 9, 2018 Tr. at 459).  Houdeshell objected to this testimony and a side-bar bench conference was held during which the State informed the trial court that it had "purposely and properly admonished [Cacy] that she's not to talk about cocaine several days in a row [but] she must have forgot [and the State] wanted the Court to know that [it] did not do that, elicit that at all." (*Id.* at 460).  The State further offered that it would not object to a limiting instruction to correct the error.  Houdeshell moved for a mistrial.  The trial court deferred ruling on Houdeshell's motion and instructed the jury as follows:

> Ladies and gentlemen of the jury, Ms. Cacy just provided an unsolicited statement as to her belief or allegation that Mr. Houdeshell's purpose in leaving the apartment that night.  Whatever his reasons or motivations for leaving are not relevant for your consideration.  So, again, I must instruct you to disregard what she said with respect to that.  It is not relevant to our proceedings.

(*Id.* at 463).  In addition, the trial court reminded the jury on the third day of trial and at the close of all evidence that it could not consider any evidence that the trial court instructed the jury to disregard.  (*See* Jan. 10, 2018 Tr. at 780); (Jan. 17, 2018 Tr. at 1505-1506).  Ultimately, the trial court denied Houdeshell's motion for a mistrial at the close of the State's case.  (*See* Jan. 16, 2018 Tr. at 1143-1146).

**{¶49}** We conclude that it was harmless for the jury to hear Cacy's statement. Cacy's statement was a brief, isolated comment on the second day of trial. *Compare State v. Harvey*, 5th Dist. Licking No. 13-CA-109, 2014-Ohio-2683, ¶ 26 ("The comments were isolated in the trial and were not so prejudicial that an impartial verdict could not be reached."). Further, Cacy's statement was immediately followed by a short, authoritative instruction to the jury by the trial judge to disregard Cacy's statement, which sufficed to remedy any possible error regarding her testimony. *See id.* ("Further, each statement was immediately followed by a short, authoritative instruction to the jury to disregard the statements that sufficed to remedy any possible error regarding the struck testimony."); *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶ 175 (noting that "the reference to Trimble's prior conviction was a brief and isolated remark that was followed by a curative instruction"). *Compare State v. Palmer*, 12th Dist. Butler No. CA2013-12-243, 2014-Ohio-5491, ¶ 27 ("The purpose of the limiting instruction was to prevent the burglary of Hatcher's law office and the theft of prescription pills and a revolver from being unfairly prejudicial. We are confident that the limiting instruction minimized any possible prejudice resulting from the admission of Hatcher's testimony.").

**{¶50}** Indeed, "'[c]urative instructions are presumed to be an effective way to remedy errors that occur during trial.'" *Palmer* at ¶ 26, quoting *State v. Parker*,

5th Dist. Stark No. 2013CA00217, 2014-Ohio-3488, ¶ 36, citing *State v. Treesh*, 90 Ohio St.3d 460 (2001). "A jury is presumed to follow and comply with instructions given by the trial court." *Id.*, quoting *State v. Carpenter*, 12th Dist. Butler No. CA2005-11-494, 2007-Ohio-5790, ¶ 20, citing *Pang v. Minch*, 53 Ohio St.3d 186 (1990). *See also State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 194. Therefore, we conclude that there is no evidence that Houdeshell did not receive a fair trial—that is, Houdeshell has not shown any evidence that that Cacy's testimony prejudicially affected outcome of the trial. *See Palmer* at ¶ 27 ("Further, because a jury is presumed to follow instructions by the trial court, we conclude the jury used the testimony at issue only for its specific and limited purpose."), citing *State v. Vega*, 9th Dist. Summit No. 19369, 1999 WL 980589, *4 (Oct. 27, 1999); *State v. Charley*, 8th Dist. Cuyahoga No. 82944, 2004-Ohio-3463, ¶ 54 ("Charley has failed to produce any evidence to convince this court that the jury considered the drugs and drug paraphernalia found at the Elyria apartment during deliberations or that it relied at all on this evidence when it found him guilty of aggravated robbery, aggravated burglary, and felonious assault.")

{¶51} Moreover, as we determined in Houdeshell's second and third assignments of error, Houdeshell's convictions are based on sufficient evidence and are not against the manifest weight of the evidence. *See Palmer* at ¶ 28; *State v. Burrows*, 11th Dist. Trumbull No. 2000-T-0089, 2002 WL 605106, *10 (Apr. 19,

2002) ("Even if we assume arguendo that the videotape was prejudicial, it is harmless beyond a reasonable doubt because of the overwhelming evidence of appellant's guilt."); *State v. Hamilton*, 8th Dist. Cuyahoga No. 86520, 2006-Ohio-1949, ¶ 14 ("Given the evidence presented by the State of Ohio concerning Hamilton's guilt in the January 23, 2005 robbery, and the curative instruction provided by the trial court, Hamilton has failed to show how he suffered any material prejudice.").

{¶52} Accordingly, based on the evidence against Houdeshell, the trial court's appropriate limiting instruction, and the presumption that a jury follows a trial court's instructions, there is little likelihood that Houdeshell was prejudiced by Cacy's statement. *See State v. Jaros*, 6th Dist. Lucas No. L-10-1101, 2011-Ohio-5037, ¶ 26 ("When there is ample evidence establishing guilt, there is no likelihood of prejudice from reference to a prior conviction."), citing *Trimble,* 122 Ohio St.3d 297, 2009-Ohio-2961, at ¶ 175. The admission of Cacy's testimony is, at most, harmless error. *See id.*

{¶53} For these reasons, it was not unreasonable, arbitrary, or unconscionable for the trial court to admonish the jury to ignore the stricken testimony as opposed to granting a mistrial. *See Harvey*, 2014-Ohio-2693, at ¶ 26, citing *State v. Pryor*, 5th Dist. Stark No. 2013CA00016, 2013-Ohio-5693, ¶ 47; *State v. Walburg*, 10th Dist. Franklin No. 10AP-1087, 2011-Ohio-4762, ¶ 53

Case No. 5-18-02

("Because the victim's reference to defendant's criminal occupations was an isolated reference, the trial court immediately sustained defendant's objection, and the court instructed the jury to disregard the question and response, the trial court did not abuse its discretion in denying defendant's motion for a mistrial."), citing *State v. McCree*, 8th Dist. Cuyahoga No. 87951, 2007-Ohio-268, ¶ 40 (concluding that the trial court did not abuse its discretion by denying McCree's motion for a mistrial because the witness's reference to the defendant's criminal history was an isolated reference, the trial court properly struck the testimony, and the trial court advised the jury to disregard it) and *State v. Woodward*, 10th Dist. Franklin No. 03AP-398, 2004-Ohio-4418, ¶ 35 (concluding that the trial court's prompt remedial actions after prejudicial testimony prevented finding that the trial court abused its discretion in denying a motion for a mistrial).  Therefore, the trial court did not abuse its discretion by denying Houdeshell's motion for a mistrial.  Houdeshell's first assignment of error is overruled.

{¶54} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW and PRESTON, J.J., concur.**

**/jlr**

-31-