[Cite as *State v. Walker*, 2020-Ohio-839.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No. L-18-1178

    Appellee                                      Trial Court No. CR0201701781

v.

Angie Walker                                          **DECISION AND JUDGMENT**

    Appellant                                     Decided:  March 6, 2020

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**ZMUDA, P.J.**

{¶ 1} This matter is before the court on appeal from the judgment of the Lucas

County Court of Common Pleas, general division, sentencing appellant, Angie Walker, to

an aggregate, minimum prison term of 23 years, arising from the death of 7 month old

L.A., the infant son of Walker's boyfriend, and imposing mandatory and discretionary

costs.  We reverse as to the discretionary costs only, and otherwise affirm the judgment of the trial court.

## I.  Facts and Procedural Background

{¶ 2} Walker lived with her boyfriend, Antonio Burkey, in a house with numerous other people, in Oregon, Ohio.  The household consisted of an unusual grouping of adults and children.  The home belonged to Michelle Bednar and her husband Tom Bednar, who lived there with their two children.  The Bednars were separated, but not divorced.  Michelle stayed on a mattress in the living room with her boyfriend, Frank Owens.  Frank's two children also lived at the house.  Tom Bednar slept in the basement during the day, and worked most nights until 4:00 a.m.  Robert Rotruck, Stephanie Mohney, and Gabriel Vasquez lived in the upstairs bedrooms, and Gabriel Vasquez may have been dating one of Frank Owens' children, a 15-year-old daughter.  Walker and Burkey slept in a front room on a mattress on the floor.  At the time of L.A.'s death, they had lived at the house only 2 or 3 weeks, but were acquainted with the Bednars through Burkey's cousin, Frank Owens.

{¶ 3} Walker and Burkey dated for five years, but had an on-and-off relationship.  There was a significant age difference between the two.  Walker began dating Burkey when he was 17 or 18 years old and she was around 35 years old.  During an "off" period in the relationship, Burkey fathered a son, L.A., with another woman, Samantha Ashley.  Initially, Burkey and Ashley clashed over custody of L.A., but by the time L.A. was 6

2.

months old, they had a more cordial relationship and had agreed to share custody, alternating weeks with L.A.

{¶ 4} Walker appeared to accept Ashley's interactions with Burkey, and her communications with Ashley were friendly in the weeks leading up to L.A.'s death. To some friends and within her journal, however, Walker expressed ill will toward Ashley. Walker was very unhappy that Ashley had Burkey's baby, and Walker told Burkey that she had been pregnant, but lost the baby, despite the fact that she could no longer conceive after having a hysterectomy some time before. The night before the death of L.A., Walker and Burkey went to a bar with Michelle Bednar and Frank Owens, leaving L.A. with Gabriel Vasquez and Owens' 15-year-old daughter as babysitters. Walker and Burkey argued about Ashley, and Burkey told Walker he intended to leave her and he thought he could do better.

{¶ 5} On the morning of April 25, 2017, Walker drove Burkey to work around 8:15 a.m., with L.A. in his car seat. Burkey kissed L.A. goodbye, and noticed no injuries. Burkey's coworker, who was also a good friend, played with L.A. briefly and indicated L.A. was smiling and happy. Walker returned home with L.A., and was admittedly the only person to have contact with L.A. prior to L.A.'s collapse.

{¶ 6} Around 10:00 or 10:15 a.m., Walker's housemates heard L.A. cry, but considered the cry normal and went back to sleep. Soon after, Walker woke her housemates, screaming that something was wrong with L.A. Walker handed the baby to

3.

Frank Owens while Michelle Bednar dialed 911, with the call logged at 10:40 a.m. L.A.'s breathing was labored, his pupils were dilated, and he was unresponsive.

{¶ 7} First responders arrived and found L.A. lying unresponsive on a table in the kitchen, gasping for breath. Walker told first responders that she had placed L.A. in a plastic booster seat, with toys, while she wrote in her journal. When L.A. began to cry, she picked him up and attempted to swaddle him for a nap, but he went limp. No one in the house attempted CPR on L.A. First responders began administering CPR to L.A. immediately. When L.A. did not respond, they transported him to the hospital, administering CPR and attempting to place a breathing tube en route.

{¶ 8} Ashley arrived at the hospital, and doctors told her that L.A. "had hemorrhaging behind the eyes and he was brain dead." They placed L.A. on a ventilator, but Ashley eventually decided to let doctors remove the ventilator. L.A. died shortly after removal of the ventilator.

{¶ 9} At the hospital, police spoke to Walker, and she told them she had given L.A. a bottle, burped him, and played with him on the bed before putting him in the baby seat. When he fussed, she reported picking him up and L.A. "went limp." Walker indicated she started "freaking out," and thought L.A. might have marks caused by her frantic efforts to seek help from her housemates. When asked about a significant bruise on the top of L.A.'s head, she suggested L.A. hit himself with a toy and scratched himself, and denied that L.A. had rolled or fallen while she watched him that morning.

4.

{¶ 10} Walker returned to the house from the hospital about an hour and one-half to two hours later, and made comments to her housemates regarding what could happen to her "if I did something to that baby." She gathered some of her belongings and left the house. Her housemates spoke with police about the rocky relationship of Walker and Burkey, the couple's argument the evening prior to L.A.'s injury, and Walker's comments regarding the consequences of harming L.A.

{¶ 11} Police also interviewed Walker twice, first at the hospital, and the next day at the police station. At the hospital, Walker denied doing anything to harm L.A., and suggested that Ashley might be responsible for L.A.'s deteriorating condition. The next day, at the police station, Walker spent more than an hour answering questions after L.A. died. Walker acknowledged she was the full-time caregiver for L.A. during Burkey's weeks, and babysat L.A. for Ashley on occasion, during Ashley's weeks. Walker felt Ashley did not provide good care for L.A., and pointed out several instances in which Ashley failed to dress or attend to L.A. properly, and recounted L.A.'s many health issues that Walker believed were caused by Ashley's shortcomings. Walker had more experience with children, as she was twenty years older than Burkey and Ashley, and had children and a grandchild of her own. Even so, she acknowledged that Burkey and Ashley constantly rebuffed Walker's attempts to give advice and reminded Walker that she was not L.A.'s mother.

{¶ 12} Police questioned Walker about all the various residents of the household, to determine who might have had access to L.A. prior to his injury. Walker confirmed

that only she spent time with L.A. that morning. She told police she fed L.A. and played with him, then placed him in his baby seat with toys while she wrote in her journal and watched an episode of Supernatural on her phone. When L.A. became fussy, Walker said she picked him up to swaddle him for a nap and he just went limp. Walker stated she "freaked out" and ran to Michelle Bednar's room to seek help, and a rescue squad arrived within minutes.

{¶ 13} Additionally, police questioned Walker about the state of her relationship with Burkey, and she acknowledged they were experiencing problems. According to Walker, Burkey did not feel she treated him like a boyfriend, because she did not like to go out with him in the evenings and did not like to initiate sex. She told police that she preferred to stay home because she was tired after a full day of housework and childcare. Walker also indicated that she sometimes found herself between Burkey and Ashley in their disputes over L.A. Walker insisted, however, that she loved L.A. as if he were her baby.

{¶ 14} During her interview, Walker made frequent references to information stored on her phone as corroboration for her story and her claims regarding Ashley's conduct toward L.A. Police subsequently examined her smart phone, and noted additional details. For example, Walker signed each of her text messages with "Mrs. Burkey," although she and Burkey never married. Based on her text and message histories, police noted Walker's frustration about having to watch Burkey's "fucking baby," and wishing a "certain person" she hated "with a passion" would leave the couple

6.

and their relationship alone.  Furthermore, a couple of weeks prior to L.A.'s death, Walker's web browser history showed a search for people being mean to babies.

{¶ 15} Shortly before L.A.'s injury and death, on April 22, Walker exchanged texts with Ashley and told Ashley she was having a depressing day, because the next day "was my due date for [Burkey's] and my baby."  She admitted to police, however, that she could not have any children after having a hysterectomy.

{¶ 16} On the morning of L.A.'s injury, Walker's smart phone activity demonstrated continuous activity from 8:31 a.m. until 9:00 a.m.  During this period, Walker sent and received text messages and email, searched the internet and downloaded videos, and viewed videos on her smart phone.  From 9:00 a.m. until the time Michelle Bednar called 911, Walker's phone showed no activity.

{¶ 17} Police also seized Walker's journal, which contained entries regarding her life with Burkey.  Walker indicated things were bad, living on a mattress in the Bednars' house after an eviction, and she did not feel confident in her relationship with Burkey or comfortable with all aspects of her sex life with him.  Walker also addressed her profound dislike for Ashley, admitting she appeared nice toward her, but inwardly resented and hated her.  Walker wrote that she did not understand why Burkey would choose Ashley over her, stating, "I'm not gonna be second to any women besides his mom and sisters and he has seemed to choose [Ashley] over me, so I guess it's time to go somewhere."  Walker wrote that she told Burkey she would leave him, "and it seemed like he didn't care" and he had already changed his Facebook status to "single."

7.

{¶ 18} On April 25, the date of L.A.'s injury, Walker wrote that she was trying to change her ways, and the only problem was Burkey's "baby momma," who she knew wanted Burkey, but asserted "she's not gonna get him."  Walker expressed sorrow about not having her own baby with Burkey, naming the baby she claimed to have conceived with Burkey and then miscarried.  Walker also recounted instances in which Ashley harmed L.A., calling Ashley a "cunt" and saying Ashley "would rather hurt [L.A.] than love him."

{¶ 19} After an investigation that included questioning Walker and the other residents at the Bednars' house, reviewing information on Walker's smart phone and in her journal, and reviewing the medical records and speaking to the medical providers, police charged Walker in connection with L.A.'s death.

{¶ 20} On May 5, 2017, a grand jury returned an indictment, charging Walker with Count 1:  aggravated murder in violation of R.C. 2903.01(C) and (F), an unclassified felony; Count 2:  murder in violation of R.C. 2903.02(B) and 2929.02, an unclassified felony; Count 3:  felonious assault in violation of R.C. 2903.11(A)(1) and (D), a felony of the second degree; and Count 4:  endangering children in violation of R.C. 2919.22(B)(1), (E)(1) and (E)(2)(d), a felony of the second degree.  On May 17, 2017, the trial court appointed counsel and Walker was arraigned.  She entered pleas of not guilty to each charge.

{¶ 21} After lengthy discovery, the matter proceeded to a jury trial on July 9 through July 12, 2018.  During the trial, Walker's counsel requested a mistrial on two

8.

occasions. First, counsel asked for a mistrial after the state played Walker's recorded interview, with redactions, that kept mention of a polygraph and of Walker's fear of executing the waiver prior to the interview. Second, counsel requested a mistrial after learning the state's witness, the Lucas County coroner, had saved tissue samples that might have been examined by the expert called by the defense, Dr. Kris Sperry. In each case, counsel argued that co-counsel was ineffective in failing to scrutinize the redacted interview recording and in failing to seek testing of the tissue samples to prove the defense theory of L.A.'s death. The trial court denied both requests for a mistrial, and gave a limiting instruction regarding the mention of a polygraph and comments related to the waiver.

{¶ 22} The state introduced testimony of Burkey and Ashley, various housemates and friends, police investigators, and L.A.'s medical providers. The state also presented expert testimony regarding L.A.'s injuries, played recordings of police interviews with Walker, and introduced Walker's journal writings and information retrieved from her smart phone through police testimony.

{¶ 23} The medical testimony focused on L.A.'s injuries and the cause of death. The state's experts testified that death resulted from abusive head trauma, while the defense theory of the cause of death was pneumonia that developed into sepsis, with disseminated intravascular coagulation ("DIC") contributing to the death.

{¶ 24} Dr. Anthony Hsu, the treating physician at St. Charles Hospital, testified that L.A. arrived to the hospital in cardiac arrest and required supported breathing to

9.

remain alive. L.A. received an intraosseous line in his leg to receive medications and a tracheal tube to support breathing. L.A. exhibited no symptoms of infection; he had a normal temperature and white blood count, and no cough or rash. Dr. Hsu ruled out infection and did not start L.A. on antibiotics. Once doctors stabilized L.A., he was transported to St. Vincent's Mercy Children's Hospital's pediatric intensive care unit for additional testing.

{¶ 25} Dr. Rashed Hasan, the chief of pediatric critical care at St. Vincent's, took over L.A.'s care. L.A. was admitted with sustained prolonged cardiac arrest, severe organ damage, and no brain function. Dr. Hasan noted the bruising to L.A.'s head. He also ruled out infection of the bloodstream, based on normal body temperature and negative blood and urine screens. Dr. Hasan noted pneumonia, but attributed it to the ventilator. He did not perform a CAT or CT scan because L.A.'s condition was too unstable. An ophthalmologist exam was performed, and indicated retinal hemorrhaging extending to the periphery of the retinas in both eyes, with retinal detachment of the right eye.

{¶ 26} Dr. Randall Schlievert consulted with Dr. Hasan. Dr. Schlievert concluded that L.A. had abusive head trauma, likely caused by shaking or violent slamming against something. Dr. Schlievert agreed with Dr. Hasan that the pneumonia was likely caused by the ventilator. He also opined that L.A.'s symptoms would have been immediate upon injury, and L.A. would not have been able to play or act normally once injured.

10.

{¶ 27} The coroner, Dr. Jeffrey Hudson, testified regarding bruises and abrasions to L.A.'s face and head, indicating blunt force trauma. Dr. Hudson described several bruises, running together, from the back of the head down through the neck, with hemorrhaging at the back of the head and within the skull, in the dura layer around the brain and directly on the brain. He also described hemorrhaging around the eyes, including retinal hemorrhaging, hemorrhages in the vitreous humor, on the sheath of the optic nerve, and in the area of the perioptic nerve sheath soft tissue, along with choroidal and retinal detachment. Significantly, Dr. Hudson testified that these injuries were consistent with trauma, and while he acknowledged that trauma could cause DIC, the hemorrhaging in and around the eyes could not be attributed to DIC in this case. Dr. Hudson, furthermore, indicated that even if L.A. had pneumonia, the ventilator was the likely cause of this condition, and pneumonia in no way contributed to L.A.'s death.

{¶ 28} The defense's expert, Dr. Kris Sperry, testified that L.A. suffered from pneumonia and sepsis, which led to DIC and his death. Dr. Sperry reached his opinion, however, without consideration of L.A.'s eye injuries that included choroidal and retinal detachment. Dr. Sperry admitted that CPR and medical treatment would not have caused these injuries. He also acknowledged that head trauma could cause DIC. Furthermore, while DIC is "disseminated," or widespread, Dr. Sperry acknowledged that L.A.'s bleeding was localized to the head, and to the area in L.A.'s leg where the intraosseous line had been inserted for treatment.

11.

{¶ 29} The jury found Walker not guilty of Count 1, aggravated murder, and guilty of the remaining offenses, murder in Count 2, felonious assault in Count 3, and endangering children in Count 4. On July 19, 2018, the trial court determined that the murder and felonious assault offenses merged, as agreed by the parties, and the state elected to proceed to sentencing as to Count 2, murder and Count 4, endangering children. The trial court imposed a 15 year to life prison term for Count 2, and 8 years in prison as to Count 4, and ordered the sentences served consecutively, for an aggregate, minimum prison term of 23 years.

## II. Assignments of Error

{¶ 30} Walker timely appealed her sentence, asserting the following assignments of error:

1. [Walker] received ineffective assistance of counsel in violation of his [sic] rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

2. The trial court erred in denying [Walker's] Crim.R. 29 motion.

3. The jury's verdict was against the manifest weight of the evidence presented at trial.

4. The trial court committed error to the prejudice of [Walker] by imposing the costs of prosecution without consideration of [Walker's] present or future ability to pay.

## A. Ineffective Assistance

{¶ 31} In her first assignment of error, Walker argues she received ineffective assistance of counsel, based on (1) trial counsel's failure to seek testing or retesting of tissue samples from L.A.'s brain; (2) failing to preview the state's redacted video to ensure all references were removed to a polygraph test and Walker's rights with regard to signing a waiver; and (3) failing to move Dr. Sperry's analysis and report into evidence.

{¶ 32} To establish ineffective assistance of counsel, Walker must satisfy a two-part test. *State v. Bradley*, 42 Ohio St.3d 136, 141, 538 N.E.2d 373 (1989); *Strickland v. Washington*, 466 U.S. 668, 688-689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). She must first demonstrate that her trial counsel's performance fell below an objective standard of reasonableness, making errors that effectively deprived her of assistance of counsel. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204. Our scrutiny of counsel's performance must be highly deferential, with a strong presumption that challenged actions fit within a sound trial strategy. *State v. Sallie*, 81 Ohio St.3d 673, 674, 693 N.E.2d 267 (1998), quoting *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

{¶ 33} Walker must next demonstrate that prejudice resulted from her counsel's deficient performance. *Hale* at ¶ 204, citing *Strickland* at 687-688, 694. Prejudice requires demonstration "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley* at 142, quoting *Strickland* at 694.

13.

{¶ 34} Walker first argues her trial counsel was ineffective because counsel never sought independent testing of the tissue samples in order to prove the defense theory of DIC caused by pneumonia and sepsis. A decision on whether to request testing that could prove a defense theory, or cross- examine the state's experts with the state's failure to perform the testing, falls within the realm of debatable trial tactics. *See State v. Davis*, 6th Dist. Wood No. WD-07-031, 2008-Ohio-3574, ¶ 30 ("trial counsel may have reasonably believed cross-examining the state's witnesses was a stronger strategic move * * * than pursuing a risky test."). Here, trial counsel challenged the state's experts based on the failure to perform the testing, with that failure argued to cast doubt on the state's theory of the case.

{¶ 35} Counsel's choice to cross-examine the state's witnesses rather than seek independent testing was within the realm of a reasonable trial strategy. Walker argues, however, that her trial counsel was ineffective, regardless of strategy, because she failed to file a motion to test or retest tissue samples from L.A.'s brain, and that testing would have been vital in refuting the state's theory of death. Walker's argument is purely speculative, as there is nothing within the record indicating what the results of that testing would have demonstrated, and we may not consider proof outside the record in a direct appeal. *See State v. Hartman*, 93 Ohio St.3d 274, 299, 754 N.E.2d 1150 (2001), citing *State v. Madrigal*, 87 Ohio St.3d 378, 390-391, 721 N.E.2d 52 (2000). Walker, accordingly, fails to demonstrate ineffective assistance of counsel based on the failure to seek independent testing of tissue samples.

{¶ 36} Walker next argues that trial counsel was ineffective in failing to preview the state's redacted recording, permitting the jury to hear reference to a polygraph and a comment regarding Walker's waiver of rights. After police had interviewed Walker for an hour, one of the detectives indicated the coroner could pinpoint the time of the injury and suggested Walker could take a polygraph, with no further mention or indication whether Walker agreed to take a polygraph. Shortly after this comment, a detective asked Walker why she said, "I'm afraid," at the beginning of the interview, prior to executing the *Miranda* form. The exchange between the detective and Walker, concerning these issues, consisted of the following:

Detective: We'll know more after maybe an autopsy, but * * * I'm obviously thinking ahead, and I'm like, you locked yourself in to you were the only one with him; within so many, we're talking about several hours. They come back and tell us baby's injuries happened in "this" time frame, then we got a problem.

Walker: Right.

Detective: So that's why I said, I think it's good that you, get you, scheduled for a polygraph * * * because otherwise, you know, it just looks bad for you. I don't know what to tell [Burkey]. And I don't know what he thinks. We're going to talk to him obviously, we're going to talk to everybody.

* * *

I don't want you to feel that we are picking on you.  The reason that we're talking to you and starting with you is because you were the one that was with him. You know, so * * *

So that's why I said, if there is anything that you can think of.  I know this is scary.  I mean, I'll be honest with you, I have concerns about why you were scared to sign the form and talk to us.  Why is that?

Walker:  Why?

Detective:  Yeah… I mean, if I didn't hurt a baby and I loved it and I wanted to get justice for that baby * * * I'd sign anything.

Walker:  I wasn't scared to sign the paper.  I'm just scared in general, that I can't believe that this is even happening, you know.

Detective:  I mean, I understand having emotion.  I understand being upset and distraught, that's a baby, but, I think, in your gut, if you know you didn't do anything, there's really not a reason to fear, because, you know.  Obviously you read the Bible * * * obviously you're God-fearing, so you know you didn't do anything wrong, there's nothing to fear.  I mean, we're not here to hang up anybody who's not guilty.

Afraid? I'm like, what are you afraid of?

Walker:  No, it wasn't signing the papers.  It just, you know.  All this stuff that is going on, and, you know, it's, it's a lot for me.  And, I didn't

even sleep last night. I cried.  Forever.  I've been crying all day, you know, for the simple fact that I cannot believe that any of this is happening.

{¶ 37} Walker's trial counsel requested a mistrial based on the jury hearing these comments.  The trial court denied the request for mistrial, and instead, gave the jury a curative instruction as part of the final jury instructions.  "Generally, a reviewing court must presume that the jury followed the trial court's curative instruction."  *State v. DePew*, 38 Ohio St.3d 275, 284, 528 N.E.2d 542 (1988), citing *State v. Ferguson*, 5 Ohio St.3d 160, 163, 450 N.E.2d 265 (1983).

{¶ 38} Walker does not challenge the trial court's ruling, denying a mistrial. Instead, Walker argues her trial counsel was deficient in failing to redact the video.  Even presuming that trial counsel's deficient performance in failing to review the redacted video, prior to stipulating to its admissibility, Walker asserts no argument regarding prejudice as to either reference in the recording.

{¶ 39} As to the polygraph test, there was only fleeting mention, with no talk of Walker either refusing or agreeing to submit to a polygraph.  The prosecutor asked no questions of witnesses regarding a potential polygraph, and aside from the curative instruction, the word "polygraph" received no further mention.  In asserting that her trial counsel was ineffective in failing to preview the video, Walker offers no argument regarding the nature of any prejudice that passing reference to a polygraph test introduced into her trial.

17.

{¶ 40} Walker, instead, relies on the mere mention of a polygraph as demonstrating prejudice to merit reversal based on ineffective assistance of counsel, offering no authority in support. Utterance of the word "polygraph," however, is not always prejudicial, without cure. A fleeting reference might present no prejudice, or a curative instruction may be adequate to remedy prejudice. *See State v. Doren*, 6th Dist. Wood No. WD-06-064, 2009-Ohio-1667, ¶ 135, citing *State v. Greer*, 1st Dist. Hamilton No. C-870333, 1988 WL 76847 (July 27, 1988); *State v. Williams*, 1st Dist. Hamilton No. C-960286, 1997 WL 133376 (Mar. 26, 1997).

{¶ 41} Walker argues no facts that support her assertion of "incriminating inferences" that could not be cured, and more than a fleeting mention of a polygraph is necessary to introduce irreparable harm, based on the entirety of the proceedings. *See, e.g., Doren* at ¶ 134-135 (where prosecutor referenced a polygraph in violation of trial court's order in limine, the evidence against defendant was otherwise "thin," and the jury "demonstrated sustained curiosity about a polygraph test by submitting seven written questions despite the first curative instructions," the reference deprived the defendant of a fair trial). Based on the fleeting nature of the comment, and without any specific argument as to prejudice, we find no support for Walker's ineffective assistance claim, relative to mention of a polygraph.

{¶ 42} Walker, similarly, provides no argument or authority in support of prejudice arising from an "attack" against her "for exercising her constitutional rights with regard to signing a waiver." Significantly, Walker identified no statement that

18.

constituted an attack. Upon review of the record, we find the detectives asked Walker why she told them she was afraid to sign the form, to which she responded she was not afraid to sign the form. While the detective's statements were potentially problematic, as improperly referencing assertion of the right against self-incrimination as a sign of guilt, Walker chose to waive her right to silence and *did* talk to police. Furthermore, the trial court gave a limiting instruction to disregard such statements, and there was no mention of the detective's statements in testimony or in the state's closing argument.

{¶ 43} The issue Walker argues on appeal, moreover, is not the trial court's failure to grant a mistrial based on the unredacted exchange between the detective and Walker, but the ineffectiveness of Walker's trial counsel in failing to seek redaction of the comments. In support of this assignment of error, Walker fails to articulate any basis for a finding of prejudice, arising from the failure to redact. To demonstrate prejudice, Walker must show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d 373, quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. Considering the weight of the evidence, demonstrating her guilt, we find no demonstration of prejudice arising from ineffective assistance of counsel.

{¶ 44} There is also no argument that Walker's waiver of her right against self-incrimination was involuntary, defective, or subsequently withdrawn, raising the issue of plain error. Walker waived her right to remain silent, and made the spontaneous statement at the beginning of her interview that she was "afraid," later explaining, after

the detective's prompting, that her fear had nothing to do with the choice to speak with detectives.

{¶ 45} Constitutional protections against self-incrimination prevented the state from using Walker's invocation of her rights as evidence of guilt. (Citation omitted.) *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, ¶ 31. Walker fails to identify how the state violated her rights, however, by permitting the jury to hear comments regarding her waiver. Clearly, the state could not use Walker's choice to remain silent as evidence of guilt. *State v. Larger*, 6th Dist. Williams No. WM-06-004, 2007-Ohio-201, ¶ 17, citing *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In considering whether Walker was prejudiced by any violation of her rights, we review for harmless error, and "this court must consider the extent of the comments, whether an inference of guilt from silence was stressed to the jury, and the extent of other evidence suggesting Walker's guilt." *Larger* at ¶ 18, quoting *United States v. Newman*, 943 F.2d 1155, 1158 (9th Cir.1991).

{¶ 46} The state did not present the conversation between Walker and detectives as evidence of guilt at trial. The trial court provided a curative instruction after Walker's trial counsel objected to the comments in a previously stipulated exhibit. In arguing error on appeal, Walker identifies no facts that might demonstrate the claimed prejudice. Therefore, considering the context and extent of the comments, the lack of any inference stressed to the jury, and the weight of the evidence of Walker's guilt, we find no support for claims of ineffective assistance of counsel based on the recorded interview.

20.

{¶ 47} Finally, Walker argues her trial counsel was ineffective in failing to move Dr. Sperry's report into evidence. Walker's trial counsel, however, did not use the report in questioning Dr. Sperry, and did not mark the report as an exhibit, indicating it was not "proper" to mark the report as an exhibit.

{¶ 48} Even presuming that trial counsel could have sought admission of the report, the report is not part of the record, and Walker can demonstrate no prejudice based on the content of the missing report. As previously stated, we may not consider whether admission of the report would have made a difference at trial, as we may not consider proof outside the record in a direct appeal. *See Hartman*, 93 Ohio St.3d at 299, 754 N.E.2d 1150, citing *Madrigal*, 87 Ohio St.3d at 390-391, 721 N.E.2d 52. Walker, accordingly, fails to demonstrate ineffective assistance of counsel based on the failure to move Dr. Sperry's report into evidence.

{¶ 49} We find Walker's first assignment of error not well-taken.

## B. Sufficiency

{¶ 50} In her second assignment of error, Walker argues that the trial court erred in denying her Crim.R. 29 motion for acquittal. An appellate court reviews a denial of a Crim.R. 29 motion for an acquittal under the same standard used in reviewing the sufficiency of the evidence. *State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965 (1995).

{¶ 51} "When a defendant challenges the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the

21.

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Bies*, 74 Ohio St.3d 320, 324, 658 N.E.2d 754 (1996), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A challenge to the sufficiency of the evidence presents a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 52} We review the evidence submitted at trial in order to determine whether that evidence is legally sufficient to support a verdict as to all elements for each convicted offense. *Thompkins* at 386. In reviewing the evidence, "circumstantial evidence is as probative as direct evidence," with circumstantial evidence, alone, sufficient to sustain a conviction. *State v. Manley*, 71 Ohio St.3d 342, 348, 643 N.E.2d 1107 (1994); *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

{¶ 53} Walker first argues that there was no direct evidence that she caused serious physical harm to L.A. or abused L.A. to support a conviction for felonious assault, the predicate offense for the murder charge or a conviction for endangering children. The jury found Walker guilty of felonious assault in violation of R.C. 2903.11(A)(1), which provides "No person shall knowingly * * * [c]ause serious physical harm to another." The jury also found her guilty of murder in violation of R.C. 2903.02(B), which provides, "No person shall cause the death of another as a proximate result of * * * committing or attempting to commit an offense of violence[.]" Felonious assault is an offense of violence, for purposes of R.C. 2903.02(B). *See* R.C.

22.

2901.01(9)(a). Finally, the jury convicted Walker of endangering children, in violation of R.C. 2919.22(B)(1), which provides, "No person shall do any of the following to a child * * * [a]buse the child[.]"

{¶ 54} Walker's argument targets the medical testimony as incomplete, based on a failure to perform a more extensive microscopic analysis or to perform additional testing and scans. Walker also argues that there was no direct evidence demonstrating she abused or caused serious physical harm to L.A.

{¶ 55} The state presented detailed medical testimony regarding L.A.'s injuries and non-accidental trauma as the cause of death, explaining the lack of additional testing based on L.A.'s unstable condition, prior to death, and the evidence supporting the coroner's conclusions after death, rendering the additional testing unnecessary. The state presented evidence as to the time of injury, based on this medical evidence as well as witness testimony indicating L.A. was uninjured at the time Walker left Burkey at work. The state also demonstrated Walker's frustration and resentment toward L.A. Finally, by her own acknowledgement, Walker had sole custody of L.A. for the next few hours, until she brought L.A., unresponsive, to Michelle Bednar and Frank Owens and asked for help.

{¶ 56} While the state presented no eyewitness testimony regarding the abuse or harm inflicted on L.A., Walker was the only person with L.A. at the time that medical experts determined the injury had occurred. Because Walker had sole custody of L.A. at that time, the state presented circumstantial evidence to satisfy these elements. "'Circumstantial evidence' is the 'proof of facts by direct evidence from which the trier

23.

of fact may infer or derive by reasoning or other facts.'" (Citations omitted.) *State v. Houdeshell*, 3d Dist. Hancock No. 2018-Ohio-5217, ¶ 16.

{¶ 57} Viewing the evidence most favorably for the prosecution, the jury could have found beyond a reasonable doubt that Walker abused and caused serious physical harm to L.A. The medical evidence, along with evidence establishing Walker's sole custody of L.A. prior to the injury, was sufficient to sustain the elements challenged by Walker, that she abused and caused serious physical harm. In this type of situation, moreover, circumstantial evidence is often the norm. *See, e.g., Houdeshell* at ¶ 16 (even without direct evidence of abuse, circumstantial evidence could sustain condition where child was in the sole care of defendant); *State v. Butts*, 10th Dist. Franklin No. 03AP-495, 2004-Ohio-1136, ¶ 29 (in case of "shaken baby syndrome," not unusual for evidence to be primarily circumstantial where "a child is in the sole custody of one adult at the time the injuries are sustained"); *State v. Villarreal*, 12th Dist. Butler No. CA2004-02-035, 2005-Ohio-1924, ¶ 22 (circumstantial evidence demonstrated serious physical harm during period defendant had sole responsibility for child).

{¶ 58} We find Walker's second assignment of error not well-taken.

### C. Manifest Weight

{¶ 59} In her third assignment of error, Walker argues the jury's verdict was against the manifest weight of the evidence. In challenging the verdict, she reiterates her argument as to the quality of the state's medical evidence in contrast to her own medical

24.

expert's testimony, and argues that the jury lost its way based on the highly emotional nature of the allegations involving the death of a young child.

{¶ 60} Unlike a sufficiency inquiry, which assesses the adequacy of evidence, a manifest weight challenge requires the court to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving any conflicts in the evidence, the jury clearly lost its way and thereby created such a manifest miscarriage of justice that the conviction must be reversed and a new trial must be ordered. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). It is possible to find adequate, sufficient evidence, yet still conclude that the judgment is against the manifest weight of the evidence. (Citations omitted.) *Thompkins* at 387.

{¶ 61} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact finder's resolution of the conflicting testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, quoting *Thompkins* at 387. Reversal is appropriate in only "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *Martin* at 175. In weighing the credibility of the witnesses, we extend deference to the jury's credibility determination, as the jury observed the witnesses' testimony, noting facial expressions, body language, and voice inflections, and had the opportunity to "discern qualities such as hesitancy, equivocation, or candor (or the lack of it)." *State v.*

25.

*Tucker*, 6th Dist. Wood No. WD-16-063, 2018-Ohio-1869, ¶ 25, citing *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 62} Walker argues the jury lost its way in crediting the testimony of the treating physicians and the coroner rather than Dr. Sperry, who attributed L.A.'s injury and death to bacterial infection, pneumonia and DIC. Walker reiterates her criticism of the state's witnesses, arguing they failed to perform adequate testing to diagnose the cause of L.A.'s injury and failed to address the fact L.A. did have pneumonia.

{¶ 63} A verdict is not against the manifest weight of the evidence based solely on conflicting evidence. *See State v. Hernandez-Martinez*, 12th Dist. Butler No. CA2011-04-068, 2012-Ohio-3754, ¶ 36, citing *State v. Jones*, 12th Dist. Warren No. CA2011-05-044, 2012-Ohio-1480, ¶ 28, quoting *State v. McDowell*, 10th Dist. Franklin No. 10AP-509, 2011-Ohio-6815, ¶ 61. In this case, the state addressed the lack of testing, and Dr. Sperry did not challenge the treating physicians' judgment in deeming some tests inadvisable based on L.A.'s unstable condition. The state's experts also ruled out pneumonia and sepsis as the cause of injury, supported by their findings of normal temperature, normal blood and urine cultures, and lack of symptoms, and deemed additional microscopic testing unnecessary, based on their findings as to the cause of death. Significantly, the state's medical testimony indicated optic nerve hemorrhaging, and choroidal and retinal detachment, which had no correlation to sepsis and pneumonia.

{¶ 64} In addition, the state challenged Dr. Sperry's credibility, noting his potential financial bias as a paid expert as well as the circumstances leading up to his

26.

early retirement as a medical examiner in Georgia. Furthermore, on cross-examination, Dr. Sperry acknowledged that his theory regarding cause of death did not explain the retinal detachment injury. In weighing all of the testimony, the jury was in the best position to make credibility determinations, and resolve conflicting testimony. It was entirely appropriate for the jury to find the state's experts more credible. *Fell* at ¶ 14. Upon review of the evidence, we are not convinced that the evidence weighed heavily against conviction, or that the jury lost its way.

{¶ 65} We find Walker's third assignment of error not well-taken.

### D. Costs

{¶ 66} In her final assignment of error, Walker argues the trial court erred in imposing costs without considering her present or future ability to pay. In reviewing the imposition of costs and financial sanctions, our standard of review is whether such imposition was clearly and convincingly contrary to law. R.C. 2953.08(A)(4) and (G)(2)(b); *State v. Jeffery*, 6th Dist. Sandusky No. S-18-041, 2019-Ohio-4612, ¶ 28.

{¶ 67} At her sentencing, the trial court indicated consideration of the record, and ordered Walker to pay "the costs of prosecution." The trial court's sentencing entry recited additional findings and imposed additional costs, as follows:

> Defendant found to have, or reasonably may be expected to have, the
> means to pay all or part of the applicable costs of supervision,[1]

---

[1] Costs of supervision are applicable only where a defendant has been placed on community control. *See State v. Cash*, 6th Dist. Lucas No. L-03-1198, 2005-Ohio-1382,

confinement, assigned counsel, and prosecution as authorized by law.

Defendant ordered to reimburse the State of Ohio and Lucas County for

such costs. * * *

{¶ 68} Costs of prosecution are awarded pursuant to R.C. 2947.23(A)(1)(a), which

provides, "[i]n all criminal cases * * * the [court] shall include in the sentence the costs

of prosecution[.]" The juror fees are included in the costs, if a case was tried to a jury.

R.C. 2947.23(A)(2)(a). These costs are mandatory, and require no finding of an ability to

pay. *See State v. Lantz,* 6th Dist. Fulton No. F-18-011, 2019-Ohio-3307, ¶ 12. In this

case, the trial court imposed the costs of prosecution on the record at the sentencing

hearing, and in the sentencing entry, with no requirement to make any findings regarding

Walker's ability to pay these mandatory costs.

{¶ 69} While costs of prosecution are mandatory without consideration of the

ability to pay, the costs of confinement and court-appointed attorney's fees are

conditioned on the ability to pay. *State v. Teal*, 95 N.E.3d 1095, 2017-Ohio-7202, ¶ 40

(6th Dist.); *State v. Wymer*, 6th Dist. Lucas No. L-18-1108, 2019-Ohio-1563, ¶ 14. As to

costs of confinement, a trial court "may sentence the offender" to "[a]ll or part of the

costs of confinement," to the extent that the offender "is able to pay." R.C.

2929.18(A)(5)(a)(ii). R.C. 2941.51(D) governs imposition of the costs of court-

¶ 15, citing R.C. 2951.021(B). The trial court did not sentence Walker to community control, but instead imposed a prison term. Because the state will not incur supervisory fees for community control, the addition of costs of supervision in the entry is superfluous.

28.

appointed counsel, and provides that such fees "shall not be taxed as part of the costs and shall be paid by the county. However, if the person represented has, or reasonably may be expected to have, the means to meet some part of the costs of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay." R.C. 2941.51(D).

{¶ 70} "Although the court is not required to conduct a hearing on a defendant's ability to pay, the record must contain some evidence that the court considered the defendant's financial ability to pay." *Jeffery* at ¶ 31, citing *State v. Maloy*, 6th Dist. Lucas No. L-10-1350, 2011-Ohio-6919, ¶ 13; *State v. Temple*, 6th Dist. Lucas No. L-18-1070, 2019-Ohio-3503, ¶ 12. Furthermore, while no hearing is required, the trial court must still impose these costs on the record, during the sentencing hearing. *Temple* at ¶ 12-13. Here, the trial court made no mention of costs of confinement or costs of court-appointed counsel at the sentencing hearing and no finding of Walker's ability to pay, but nevertheless, added these costs and findings in the sentencing entry. Including these costs in the sentencing entry, without imposing them on the record at sentencing, is not sufficient. *Temple* at ¶ 13, citing Crim.R. 43(A).

{¶ 71} While not disputing the trial court's failure to address costs of confinement and court-appointed attorney's fees on the record, the state argues that R.C. 2947.23(C) applies to these costs as "costs of prosecution," and therefore any error is harmless because Walker may file a motion to waive costs at any time. In support, the state relies on the Ohio Supreme Court's holding in *State v. Beasley*, 153 Ohio St.3d 497,

29.

2018-Ohio-493, 108 N.E.3d 1028, ¶ 263.  The determination regarding costs in *Beasley,* however, was limited to costs of prosecution imposed pursuant to R.C. 2947.23(A)(1)(a), not mentioned at sentencing but included in the sentencing entry.  *Id.*

{¶ 72} We have consistently held that the "costs of prosecution" do not include costs imposed under separate statutory provisions, requiring separate determinations.  *See State v. Faulkner*, 6th Dist. Lucas No. L-10-1147, 2011-Ohio-2696, ¶ 9 ("costs of prosecution" do not include court-appointed attorney's fees, imposed pursuant to R.C. 2941.51 after considering ability to pay); *State v. Welninski*, 2018-Ohio-778, 108 N.E.3d 185, ¶ 112 (6th Dist.) ("costs of prosecution" do not include costs of confinement, imposed pursuant to R.C. 2929.18(A)(5) after considering ability to pay); *see also Middlebrooks*, 6th Dist. Sandusky No. S-18-032, 2019-Ohio-2149, ¶ 33 ("The trial court's use of 'court costs' does not also mean the costs of confinement and appointed counsel provided for in R.C. 2929.18(A)(5)(a)(ii) and 2941.51(D), respectively, which are not mandatory, and which require a separate finding that the offender has the ability to pay").

{¶ 73} Because the trial court failed to make any finding regarding Walker's ability to pay costs that are expressly conditioned on the ability to pay, or to impose those costs on the record at the sentencing hearing, the trial court's addition of these additional costs in the sentencing entry constituted error.

{¶ 74} Accordingly, Walker's fourth assignment of error is found well-taken, in part, as to the trial court's imposition of court-appointed counsel fees and confinement

costs.  We therefore vacate the imposition of the court-appointed counsel fees and confinement costs.  The imposition of the costs of prosecution remains undisturbed by this decision.

### III.  Conclusion

{¶ 75} Based on the forgoing, we find substantial justice has not been done, and we reverse, in part, and affirm, in part.  We hereby vacate the imposition of costs of confinement and court-appointed attorney's fees, with the imposition of costs of prosecution to remain in force.  We affirm the remainder of Walker's conviction and sentence, and split the costs of this appeal between the parties pursuant to App.R. 24.

Judgment reversed, in part,
and affirmed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.  *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.

Arlene Singer, J.

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.